**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re SALE OF PARK AVENUE PROPERTIES.**

**No. 70-347.**

United States District Court, E. D. Pennsylvania.

Oct. 20, 1972.

Covington & Burling by Charles Horsky, Washington, D. C., and Blank, Rome, Klaus & Comisky by Marvin Comisky, and Dennis Faucher, Robert W. Blanchette, and Edwin K. Taylor, Philadelphia, Pa., for the trustees, Penn Central Transportation Co.

Sullivan & Worcester, New York City by Joseph Auerbach, Boston, Mass., and Tate & Ervin by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford Railroad.

Cornelius C. O'Brien, Jr., Philadelphia, Pa., for Beatrice Brown.

Kelley, Drye, Warren, Clark, Carr & Ellis by Edward Roberts, III, and Robert L. Crawford, New York City, for Manufacturers Hanover Trust Co., as indenture trustee.

Ballard, Spahr, Andrews & Ingersoll by Richardson Blair, and Alan S. Fellheimer, Philadelphia, Pa., for Girard Trust Bank.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, and Alan S. Fellheimer, Philadelphia, Pa., for Morgan Guaranty Trust Co., as R & I indenture trustee.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., White & Case by Robert L. Clare, III, New York City, for Bankers Trust Co. and Morgan Guaranty Trust Co. of New York, as trustee of the Lake Shore collateral mortgages.

Davis, Polk & Wardwell by John R. Leekley, New York City, for Morgan Guaranty Trust Company of New York, as Harlem indenture trustee.

Wolf, Block, Schorr & Solis-Cohen by Michael L. Temin, Philadelphia, Pa., for First Pennsylvania Banking & Trust Company, as indenture trustee.

Morgan, Lewis & Bockius by John N. Schaeffer, Jr., Philadelphia, Pa., for The Fidelity Bank.

Willkie, Farr & Gallagher by Walter H. Brown, Jr., New York City, for Institutional Investors, Penn Central Group.

Clark, Ladner, Fortenbaugh & Young by W. Charles Hogg, Jr., and Edward C. Toole, Jr., Philadelphia, Pa., for Atchison, Topeka & Santa Fe Railway Co., Burlington Northern, Inc., Chicago & Eastern Illinois Railroad, and Soo Line Railroad Co.

FULLAM, District Judge.

## INTRODUCTION

The Trustees seek authorization to sell certain major real estate holdings of the Debtor located in the Park Avenue area of the City of New York, for prices totalling $59,549,000. Conditional or absolute objections to some or all of the proposed sales have been interposed by several interested parties, on a variety of legal and factual grounds.

The following issues, directly or indirectly related to the proposed sales, are presented for decision:

*Issues applicable generally:*

1. Would the proposed sales, as a matter of business judgment, be in the best interests of the Debtor's estate and its reorganization?

(a) Should the sales be approved on the assumption that the Trustees cannot or will not disaffirm existing leases?

2. Does § 77(*o*) of the Bankruptcy Act empower the Court to approve the proposed sales, or must approval await the adoption of a reorganization plan?

3. May the proposed sales be carried out without the consent of the New Haven Trustee?

4. Are the trustees entitled to use the income from the properties for operating expenses, or must the income be sequestered, either

(a) by reason of the rights of the New Haven trustee? or

(b) by reason of the rights of certain indenture trustees?

*Issues applicable to properties leased from the New York and Harlem Railroad Company ("Harlem")*

5. Is the Harlem lease valid and subsisting?

6. May the Trustees affirm the Harlem lease, or may the Harlem now terminate it instead?

(a) If the Trustees affirm the lease, does this require present payment of the (accelerated) principal of the bonds secured by the Harlem mortgages?

(b) If the Trustees affirm the lease, must they now pay dividends on the Debtor's Harlem stock pledged as collateral for the R&I mortgage?

7. May the Trustees carry out the proposed sales without the consent of the Harlem?

8. May the Trustees carry out the proposed sales without the consent of the indenture trustees of the Harlem mortgages?

For the reasons hereinafter expressed, I have concluded that the proposed sales may lawfully be consummated at this time, that whether they should or should not be authorized is primarily a matter of business judgment, and that certain of the sales should be approved, while others should not.

Because of the magnitude of the transactions and the complexity of the issues involved, it is necessary to set forth the facts in some detail.

## FINDINGS OF FACT

1. The Debtor's estate includes various real estate holdings in the Borough of Manhattan, in the City of New York, commonly known as the Park Avenue Properties (the "Properties").

2. In general, the Debtor has constructed rail facilities below the street level of these properties. The use of the subsurface rights for the Debtor's rail operations has not detrimentally affected the value or usefulness of the surface and air rights for commercial development.

3. The Properties have been developed during this century for office or hotel use.

4. The Debtor's interests in the Properties are of two kinds: fee interests originally acquired by the Debtor's corporate predecessors; and leasehold rights under a 401-year lease executed in 1873 by the New York and Harlem Railroad Company (the "Harlem") in favor of the New York Central and Hudson River Railroad Company. Certain of the Properties were developed on parcels in which the Debtor has combined fee and leasehold rights.

5. The Trustees own the fee interest in the following Properties either directly or through a wholly-owned subsidiary:

51 East 42nd Street
Biltmore Hotel
Yale Club
52 Vanderbilt Avenue
Commodore Hotel
Lexington—43rd Street Driveway
Graybar Building
280 Park Avenue—West Building (Bankers Trust Building)
466 Lexington Avenue
245 Park Avenue (American Brands Building)
299 Park Avenue (Westvaco Building)
Barclay Hotel
Waldorf Astoria Hotel
280 Park Avenue—East Building (Bankers Trust Building) approximately 75% of the fee interest
230 Park Avenue—tenant in common

6. The Harlem owns the fee interest in the following, subject to the Trustees' leasehold interest pursuant to the Harlem lease:

Air rights over Grand Central Station
Pan Am Building
Roosevelt Hotel
383-84 Madison Avenue
250 Park Avenue
270 Park Avenue (Union Carbide Building)
280 Park Avenue—East Building (Bankers Trust Building) approximately 25% of the fee interest
230 Park Avenue—one of the tenants in common
320 Park Avenue (ITT Building)
350 Park Avenue (Manufacturers Hanover Trust Company Building)
277 Park Avenue (Chemical Bank Building)

7. In the majority of cases the Debtor's estate is the lessor under long-term ground leases, the improvements having been constructed by the ground lessee or other entity.

8. The annual cash flow to the Debtor from the Properties is subject to fluctuations occasioned by the participation provisions or similar arrangements found in many of the ground leases. The actual rental payment received by the Debtor from the Properties exclusive of tax payments made directly to the City of New York under the respective leases or pursuant to orders of this Court is approximately $20 million to $22 million per annum. Capital improvements to the hotels cost the Debtor between $2 million and $3.5 million per annum, and the Debtor's annual tax liabilities on the Properties, over and above taxes paid directly by the lessees total approximately $6.5 million per annum.

9. Assuming continued deferral of taxes, the annual cash flow from the Properties is in the area of $16 to $17 million. If taxes were to be paid on a current basis, the cash flow would be about $10 to $11 million per year.

10. The Trustees' fee interests and leasehold rights in the Properties are subject to three mortgages known as the Hudson River Mortgages:

a. The New York Central & Hudson River Railroad Company 3½% mortgage dated June 1, 1897;

b. The New York Central and Hudson River Railroad Company Consolidated Mortgage dated June 20, 1913;

c. The New York Central and Hudson River Railroad Company Refunding and Improvement Mortgage dated October 1, 1913 ("R & I Mortgage").

11. Security for the Hudson River Mortgages consists in part of approximately 2,000 route miles and 4,000 track miles of the Central's operating property east of Buffalo. The R & I Mortgage is also secured by a lien of various rankings on an additional 1,700 route miles and 3,500 track miles as well as a lien on the Debtor's leasehold rights under six lease agreements covering 2,300 route miles and 4,200 track miles.

12. Definitive segregation studies are not available to determine the losses incurred by various segments of the Debtor's system. It is estimated that the losses on the line constituting the security for the Hudson River Mortgages is equal to or greater than the annual cash flow from Park Avenue Properties.

13. The Harlem's reversionary fee interest in the Properties is subject to two mortgages:

a. The New York and Harlem Railroad Company 3½% Gold Bond Mortgage dated June 1, 1897;

b. The New York and Harlem Railroad Company 4% Mortgage dated July 1, 1943 (the Second Harlem Mortgage).

14. In May of 1971, the Trustees decided to solicit bids for the Properties in order to determine whether any or all of the Properties could be sold for prices consistent with fair market value. On June 21, 1971, the Trustees authorized the issuance of an invitation to the public to submit bids, not later than October 15, 1971, for the purchase of any one or more of the Properties.

15. The Trustees were not bound to accept any bids. Evaluations of the bids and decisions to accept or reject the bids were made by the Trustees upon recommendations of in-house personnel, and two retained consultants, Mr. John Guest of the Trustees' financial consultants, Kuhn, Loeb & Company, and the Trustees' real estate consultants, Jackson-Cross Company.

16. The recommendations to the Trustees by Jackson-Cross Company were formulated without reference to the fact that the Debtor was in reorganization under § 77.

17. Jackson-Cross Company's appraisals of each property were not adjusted to reflect the fact that all of the Properties were subject to bid at one time. The market value of each property was determined separately according to accepted appraisal practices, to wit: that the market value of income-producing real estate is based on the "income stream" generated by the parcel and the application of an appropriate discount factor or multiple.

18. The selection of a discount factor for each building was in accord with sound appraisal techniques and fully reflected the status of the real estate market for the kinds of properties involved.

19. In addition to the appraisals described in findings 17 and 18, Jackson-Cross Company applied similar techniques in arriving at alternate market values predicated on the assumption that the Trustees could now disaffirm the ground leases and renegotiate the terms thereof at present market rates. These alternate values are higher than the basic appraisals because of the long term nature of present lease agreements and the fact that they were executed, in most cases, many years ago when different market rates prevailed.

20. The Trustees have executed agreements of sale of their interest in six of the Properties subject to the approval of this Court, and have petitioned for approval of those agreements. Under the agreements, all subsurface rights and related surface rights necessary for rail operations have been reserved by the Trustees.

21. Pursuant to the agreements, the Trustees propose to sell the following property interests:

a. A fee interest in property, approximately 9,105 square feet in area, situate at 52 Vanderbilt Avenue, southwest corner of 45th Street and Vanderbilt Avenue, and the 20-story office building thereon known as the Vanderbilt Concourse Building (52 Vanderbilt Avenue). The property is presently leased to 51st St. Realty Corporation, an indirect wholly-owned subsidiary of Debtor, as assignee, under a lease which is terminable by either party at the end of any month on ten days' notice; the property is subleased to numerous subtenants.

b. A leasehold interest in property, approximately 15,062 square feet in area, situate at 350 Park Avenue, between 51st and 52nd Streets, which includes thereon a portion of a 30-story office building known as Manufacturers Hanover Trust Company Building (350 Park Avenue). The property is presently leased to Manufacturers Hanover Trust Company, as successor tenant, for a term expiring December 31, 1990 (subject to two 21-year renewals).

c. A combination fee and leasehold interest in property, approximately 24,970 square feet in area, situate at 280 Park Avenue, between 48th and 49th Streets, which includes thereon a 30-story office building known as Bankers Trust Building—East Building (280 Park Avenue-East). 280 Park Avenue-East is presently leased to Rose Associates for a term expiring November 30, 2006 (subject to a 21-year renewal) and subleased by Rose Associates to Bankers Trust Company.

d. A fee interest in property, approximately 12,000 square feet in area, situate at 280 Park Avenue, 124' 4" West of Park Avenue, between 48th and 49th Streets, which includes thereon a 16-story office building known as the Bankers Trust Company—Middle Building (280 Park Avenue-West). 280 Park Avenue-West is presently leased to Sigmund Sommer for a term expiring January 1, 2018 (subject to a 25-year renewal), and subleased by Sommer to Bankers Trust Company.

e. A combination fee and leasehold interest in property, approximately 69,154 square feet in area, situate at 230 Park Avenue, between 45th and 46th Streets and Vanderbilt Avenue and the northerly extension of Depew Place, and the 34-story office building thereon known as the New York General Building (230 Park Avenue). 230 Park Avenue is presently leased to New York Bank for Savings, as successor tenant, for a term expiring October 14, 1983 (subject to a 25-year renewal).

f. A fee interest in property, approximately 81, 337 square feet in area, situate at 245 Park Avenue, between 46th and 47th Streets and Lexington and Park Avenues, which includes thereon a 47-story building known as the American Brands Building (245 Park Avenue). 245 Park Avenue is presently leased to Uris 245 Park Corporation for

a term expiring May 14, 2002 (subject to two 30-year renewals).

22. In addition to the mortgage liens set out in Findings 10 and 13, the six properties are also subject to various judgment and tax liens.

23. The bids accepted by the Trustees for the six properties were the highest bids submitted in each case.

24. The following tables provide a comparison of the appraised value of the properties and the accepted bids.

Table I—Present Lease Agreements in Effect

| Property | Accepted Bidder | Income | Appraised Value | Net Consideration | % of Consideration to appr'd value |
|---|---|---|---|---|---|
| 52 Vanderbilt | Van Corner Corp. | 366,000 * | 4,250,000 | 4,128,000 | 97.1% |
| 280 Park West | Bankers Trust | 80,000 | 1,200,000 | 1,211,000 | 100.9% |
| 245 Park | Corporate Property Investors | 1,234,000 | 16,200,000 | 14,994,000 | 92.6% |
| 350 Park | Manufacturers Hanover | 165,000 | 2,300,000 | 3,351,000 | 145% |
| 280 Park East | Rose Associates | 262,000 | 4,100,000 | 5,251,000 | 128.1% |
| 230 Park | Corporate Property Investors | 2,303,000 * | 30,600,000 | 30,614,000 | 102% |
| Total | | 4,410,000 | 58,650,000 | 59,549,000 | 101% |

Table II—Appraisal Values Adjusted for Disaffirmance

| Property | Alternate Appraisal Value | Net Consideration | % of Consideration to Alternate Appraisal Values . |
|---|---|---|---|
| 52 Vanderbilt | Not applicable, Debtor owns fee & improvements under immediately terminable lease to subsidiary | | |
| 280 Park West | 1,420,000 | 1,211,000 | 85.3% |
| 245 Park | 26,400,000 | 14,994,000 | 56.8% |
| 350 Park | 5,270,000 | 3,351,000 | 63.3% |
| 280 Park East | 8,700,000 | 5,251,000 | 60.4% |
| 230 Park | 35,000,000 | 30,614,000 | 87.5% |
| Total | 76,790,000 | 55,421,000 | 72% |

25. The sale agreements for 52 Vanderbilt and 230 Park Avenue contain provisions allowing the Trustees either to continue to supply electricity, steam and hot water to these properties, or to pay to the purchasers the cost of renova-

* The figures given are net after property taxes, and in the case of 52 Vanderbilt and 230 Park Avenue after a deprecia- tion allowance. Absent the depreciation allowance the income would be stated at $4,888,000.

tions necessary to allow the purchasers to secure these utility services from other sources. The estimated price of renovations is $2,000,000.

26. The net income from the six Properties, $4,410,000, is 7.41% of the total consideration of $59,549,000. Specifically, the net income as a percentage of the proposed prices for each property is as follows:

| Subject Property | Income after property taxes & depreciation | Percentage of income to proposed consideration |
|---|---|---|
| 52 Vandebilt Avenue | $366,000 | 8.86% |
| 350 Park Avenue | 165,000 | 4.93% |
| 280 Park Avenue—West | 80,000 | 6.61% |
| 280 Park Avenue—East | 262,000 | 4.99% |
| 230 Park Avenue | 2,303,000 | 7.52% |
| 245 Park Avenue | 1,234,000 | 8.23% |
| Total | $4,410,000 | 7.41% |

Using the income stated without depreciation, $4,800,000, the net income as percentage of the consideration is 8.2%.

27. As part of the federal loan guarantee transaction pursuant to the Emergency Rail Service Act of 1970, Secretary Volpe of the Department of Transportation and the Trustees executed an "Agreement on Terms and Conditions." Paragraph 8 of exhibit A to the Agreement, provides:

"The Trustees shall, within 30 days from the date of execution of the Guarantee Agreement, submit to the Secretary a plan for the sale of non-transportation assets of the company and its corporate subsidiaries (including, but not limited to, security holdings)."

28. Absent the responsibility imposed by the Department of Transportation, the Trustees would have solicited bids for the Properties and accepted the six bids set out in Finding 21 for the following reasons:

a. The bids, viewed in light of the appraisals, represent fair market prices;

b. It is preferable in the Trustees' judgment to have liquid assets or short-term investments rather than the real estate interests they hold in the six properties;

c. If the sale proceeds were made available for capital projects on the railroad operating property, the rate of return would, according to projections of Debtor's operating management, be equivalent to 20%;

d. In the event the reorganization did not prove "successful" and as a consequence draw downs of the proceeds were not sought or authorized, the funds would be available for use determined by the Court; and

e. There is some risk that the market value of the six properties might decline in the future.

29. Mr. Guest, the Trustees' outside financial consultant, expressed concern that the failure to accept the more favorable bids might cause the real estate industry to be skeptical of future solicitations by the Trustees and thereby depress the market or markets for later offerings.

30. The 1972–1973 road capital budgets are not premised on the availability of the proceeds of the proposed sales. This does not mean that there are not further necessary or desirable capital projects, but merely that the capital budgets were drawn up under certain constraints dictated by the lack of available cash.

31. The Trustees have no specific program for use of these funds at the present time.

32. In general, the administration of the Properties requires minimal management effort, and does not impede management of rail operations. The hotel properties may involve additional considerations not raised by the present petitions.

33. In order to realize $4,888,000 (the present income from the six properties) in income from the proceeds, an investment return of 8.27% per annum

would be necessary. Allowance for depreciation on 52 Vanderbilt and 230 Park Avenue would result in a stated income of $4,410,000 from the six properties, and the necessary investment return on the total sale price would be 7.2%

34. The actual return on the proceeds of sale would be controlled in part by the Trustees' objectives, liquidity and risk avoidance, and in part by the rights of the bondholders secured by the six properties being sold, since their mortgage lien attaches to the proceeds of sale, at least until the time that a draw down were to be authorized.

35. The most likely investment opportunity available under the guidelines mentioned in Finding 34 would be short-term obligations guaranteed by the Full Faith and Credit of the United States.

36. The exact return that could be realized from the proceeds of sale is, of course, a function of the money market now and in the future. A return of 5.-5% (approximately $3.3 million) or 6% (approximately $3.6 million) is a realistic estimate for intermediate term investments. If the term were less than nine months, realistic rates would be in a range of 5% (approximately $3 million), 4.5% (approximately $2.7 million), or 4.25% (approximately $2.5 million).

37. Without allowance for fluctuations in the income from the six properties attributable to participation provisions, the annual cash loss on 5½ and 6% investments computed on the after-tax income is in the range of $1,588,000 to $1,288,000, and computed on the after-tax and depreciation allowance income is in the range of $1,110,000 to $810,000.

38. 280 Park Avenue West and East, 245 Park Avenue and 350 Park Avenue are under long-term ground leases to responsible lessees secured by the improvements constructed by the lessee. The 230 Park Avenue lease is of ground and improvements. Moreover, these five buildings are located in one of the most desirable areas of New York City. Because of the above characteristics, the market values of the Trustees' interests in these properties are less likely to be affected by economic cycles and fluctuations than a fee interest ownership right where the owner operates and leases the premises to many lessees for predominately short terms. Similarly, although the market values of these properties are related to prevailing rates in the money market, the value of the five properties is less "volatile" than the money market.

39. To the date of the hearings, the Trustees had incurred costs in the amount of $301,404.96 in the public offering of the Properties, exclusive of legal fees and expenses.

40. The Debtor is, by succession, the lessee under a lease executed in 1873 for the term of 401 years between the New York Central & Hudson River Railroad Company (hereinafter the "Central") and the New York and Harlem Railroad Company ("Harlem"). This lease had been supplemented and amended by agreements dated May 15, 1882 (Supplemental Contract), October 5, 1898 (Second Supplemental Contract), and July 1, 1943 (Third Supplemental Contract).

41. At the time of the lease the Harlem had outstanding bond issues secured by mortgages on the Harlem properties.

42. The original lease covered substantially all of the Harlem's railroad property, associated personal property, and contractual rights, but excluded the Harlem's so-called street railroad in New York City, and real property south of 42nd Street in that City. The principal line subject to the lease consisted of 132 miles of operating property extending from 42nd Street in New York City to Chatham Four Corners above New York City.

43. The lease was a vehicle chosen to cause the Harlem to "be controlled, managed and operated" by the Central.

44. The rental provisions required payment to the Harlem of $4 per share outstanding, or an 8% return per annum

on the par value of the Harlem stock. Certain tax liabilities of the Harlem were also assumed by the Central.

45. The Central also agreed to pay interest on the mortgage obligations of the Harlem then outstanding, and to pay the principal of all mortgages except the Consolidated Mortgage which was to mature in 1900. As to the latter, the Central agreed to pay the principal if the Harlem did not do so. In the event the Central did pay the principal of the Consolidated Mortgage, the Harlem agreed that at the request of the Central the Harlem would issue bonds in like amount. The agreement also required the Harlem to issue new bonds when and if any refunding issue matured and was paid by the Central.

46. The Central was granted a power of sale over the properties subject to the lease which were not necessary for railroad operations, subject to an accounting for the proceeds at termination of the lease in due course or in the event of termination for default, with a set off for real property acquired by the Central from its own funds for operation of the Harlem lines. An equivalent provision covering personal property required that at termination the Central "deliver to. [the Harlem] personal property of similar kind and equal in value."

47. In 1882, the parties executed a Supplemental Contract which provided that neither the directors nor shareholders of the lessee or lessor could effectuate any change in the first or second articles of the original lease, and that the rental reserved by the original lease was to be paid during the entire term.

48. On June 1, 1897, the Harlem 3½% Gold Mortgage was executed securing a bond issue not to exceed $12 million maturing in the year 2000. The Gold Bond issue was for the purpose of refunding the Harlem's 7% Consolidated Mortgage, which was to mature on May 1, 1900.

49. The description clause of the Gold Bond Mortgage subjected to the mortgage lien the Harlem's interests in the railroad property as well as the Harlem's rights under the original 1873 lease to the Central.

50. The Habendum Clause provided:

"To have and to hold, the premises, railroads, properties, real or personal, rights, franchises, estates and appurtenances hereby conveyed and assigned, or intended to be conbeyed, or assigned, unto the Trustee, its successors and assigns forever:

"*Subject, however*, to the rights of The New York, New Haven and Hartford Railroad Company, in respect of any of the said property, under a certain agreement bearing date March 17, 1848, and a tripartite agreement bearing date November 1, 1872; and also *to the rights of The New York Central and Hudson River Railroad Company* in respect of any of the said property under the said tripartite agreement bearing date November 1, 1872, and *under the lease above mentioned, bearing date April 1, 1873.*" [Emphasis added]

51. Article Six of the Gold Bond Mortgage contained release of lien provisions. Sections 1 and 2 of the Article provided in part as follows:

"Sec. 1. Upon the written request of the Railroad Company, approved by resolution of its Board of Directors or Executive Committee, the Trustee, from time to time, while the *Railroad Company is in possession of the mortgaged premises*, but subject to the conditions and limitations in this Section prescribed, and not otherwise, shall release from the lien and operation of this indenture any part of the mortgaged premises then subject thereto; provided, (1) that no part of the lines of track or of the rights of way shall be released, unless the same shall no longer be of use in the operation of any of the mortgaged lines of railway, and no part of such lines of track or rights of way shall be so released if thereby the continuity of the lines of railway of the Railroad Company shall be broken; and (2) that no

part of the mortgaged railways or other property shall be released hereunder, unless at the time of such release it shall no longer be necessary or expedient to retain the same for the operation, maintenance, or use, of such lines of railway, or for use in the business of the Railroad Company."

"Sec. 2. *The Railroad Company, while in possession of the mortgaged premises,* shall also have full power, in its discretion, from time to time, to dispose of any portion of the machinery, equipment and implements, at any time held, subject to the lien hereof, which may have become unfit for such use, replacing the same by new machinery, equipment or implements, which shall become subject to this indenture." [Emphasis added]

52. There are $2,430,000 in Harlem Gold Bonds outstanding and an additional $5,959,000 in principal amount of said bonds which are held by the mortgage trustee in the sinking fund. Bonds in the sinking fund are entitled to interest payments.

53. A dispute and litigation arose between the Central and the Harlem over who would benefit from the 50% reduction in interest costs ($420,000 per annum) occasioned by the 3½% Gold Bond rate versus the 7% rate on the consolidated bonds which were refunded by the Gold Bond issue.

54. The Second Supplementary Contract was executed on October 5, 1898, in settlement of the litigation instituted by the Central, pursuant to which:

a. The Central litigation was terminated;

b. The rental payment per share was increased by $1 per annum, thereby raising the return at the par value of each share to 10%;

c. Central agreed to tender the funds to pay the Consolidated Mortgage at maturity, and in turn the Harlem agreed to issue to the Central bonds under the Gold Bond mortgage equal to Central payments;

d. The original lease obligation to pay the Harlem's funded debt was modified to reflect an unconditional obligation on the part of the Central to pay the Consolidated mortgage and any refunding mortgage or mortgages.

55. By 1943, the Central owned 23,119 shares of the Harlem's 26,879 outstanding preferred and 114,321 of the 173,121 outstanding common.

56. In 1943, a dispute and ensuing litigation arose concerning the Central's obligations under the original lease to pay income and excess profit taxes of the Harlem. The Central contended that any such payments made on behalf of the Harlem were to be subtracted pro rata from the $5 per annum dividend rental. In 1942, said payments on behalf of the Harlem were $330,630.

57. The Third Supplemental Contract to the original lease as theretofore amended was executed as a means of amicably settling this dispute. Under the Third Supplemental Contract:

a. The Central terminated its litigation;

b. The Harlem agreed to issue $7,800,000 in principal amount of Second Mortgage Bonds to be purchased by the Central;

c. $2,500,000 of the purchase price of the bonds were to be turned over by the Harlem to the mortgage trustee of the Harlem Gold Bond Mortgage to be used as a sinking fund to retire but not cancel Harlem Gold Bonds. The mortgage trustee was to receive interest on the retired bonds;

d. The remaining $5,300,000 in purchase price was waived by the Harlem in consideration of the Central's release of all claims for past due tax payments, cancellation of certain Harlem debts to the Central, and the costs incurred by the Central in the bond issue and associated formalities;

e. The $7,800,000 in principal amount of Harlem bonds acquired by the Central were to be used for an exchange offer to the non-Central shareholders of

the Harlem on a basis of $125 principal amount of 4% bonds for each share of Central stock;

f. 4% on $125 returned $5 per annum to the holder, the equivalent of the return to the stock under the rental provision of the lease as modified;

g. The Second Mortgage was specified as constituting, for the purpose of the lease as modified, a refunding of the Harlem Gold Bond Mortgage, and, hence, the Harlem Gold Bond Mortgage could not be refunded again;

h. Central agreed to pay the interest and principal of the Second Mortgage bonds; and

i. The lease was modified to require payment of the $5 per annum per share only to non-Central shareholders of the Harlem. The Central's Harlem stock had been pledged as security for the Central's Refunding and Improvement Mortgage of 1913. The lease provided that suspension of rental payments to the Central as shareholder would not apply if the R&I mortgage trustee was not required under the mortgage to turn over stock dividends on pledged stock to the Central.

58. The recital section of the Harlem Second Mortgage noted the Central's leasehold interest under the original lease, and the granting clauses included the following:

"The leasehold right, title and interest of the Company [the Harlem] as lessor in and under the lease hereinabove mentioned."

59. The Habendum Clause provided in part:

"Subject, However, . . . to the rights of the New York Central Railroad Company in

respect of any of said property under the Lease above mentioned as amended . . . ."

60. Article Six of the Second Mortgage pertains to release of property subject to said mortgage lien at the request of the Harlem upon certain terms and conditions.

61. The Central and Harlem submitted in support of their petition under section 20(a) and section 5(2) of the Interstate Commerce Act, the Third Supplemental Contract and Second Mortgage along with summaries of the terms of said contract and mortgage.

62. From 1897 through 1953, 64 releases from the Gold Bond Mortgage and 23 releases from the Second Mortgage were executed by the mortgage trustee of these mortgages pursuant to requests from the Harlem, but transmitted by the Central to the mortgage trustee.

63. For the most part, complementary certifications of application of the proceeds to capital improvements ("A's and B's") on the Harlem property were submitted to the mortgage trustee by the Harlem at a later date.

64. Proceeds from sales that were consummated from 1938 through 1942 were transmitted to the mortgage trustee pending certification of "A's and B's" or acquisition of other property.

65. Some time about 1942 the Hudson River mortgage trustee requested that the proceeds be held in escrow: the Harlem mortgage trustee consented.

66. Since 1953, the Central has apparently contended that proceeds of sales of Harlem leasehold properties were not subject to the lien of the Harlem mortgages.

67. On July 1, 1970, a $2.50 semi-annual rental dividend came due, and on January 1, 1971, a second semi-annual dividend came due.

68. In the early months of 1971, the Trustees became aware of the fact that revenues from Harlem leasehold properties substantially exceeded rental payments.

69. On March 12, 1971, the Trustees of the Debtor authorized payment of both rental payments mentioned in Finding 67. Subsequent rental dividend payments have been made by the Trustees. The Harlem lease is the only domestic lease on which the Trustees have authorized payment of rentals.

70. Real estate taxes payable annually by the Debtor on Harlem properties (not including taxes payable by tenants pursuant to the leases or orders of this Court) are approximately $1,700,000. Tax liabilities in this sum have been accruing and remain unpaid since the filing of the Debtor's reorganization petition.

71. Annual interest on the Harlem Gold Bonds amounts to $293,615 on $2,430,000 in bonds held by the public and $5,959,000 in bonds held by the mortgage trustee in the sinking fund. Annual interest on the Harlem Second Bonds of $470,000 in Series A and $7,350,000 in Series B (exclusive of the Debtor's $780,000 holding of the bonds) amounts to $281,600. The Trustees have made interest payments on the Harlem bonds since the filing of the present petition.

72. Allowing approximately $50,000 for the Harlem's corporate expenses, the annual rental payments (dividend to public shareholders, interest, real estate taxes, and corporate expenses) total approximately $2,325,000.

73. Annual rental from Harlem leasehold properties excluding direct real estate tax payments by lessees of the Debtor total approximately $9,000,000. Net income is $9,000,000 less $2,325,000 or $6,675,000.

74. The estimated market value of all property rights in the Harlem properties is $105,000,000.

75. Relying on the Harlem's unpaid real estate taxes and consequent tax liens as defaults the Gold Bond Mortgage trustee has notified the Harlem that the bonds have been accelerated, and that the principal is now due and in default.

76. Counsel for the Trustees have apparently withdrawn their original contention that acceleration was not authorized under the mortgage in cases of unpaid real estate taxes or tax liens.

77. The trustee of the Second Harlem Mortgage has also declared a default and given notice of acceleration of the principal.

78. The Trustees' Harlem stock is pledged as partial security for the Central's Refunding and Improvement Mortgage.

79. Under Article Nine, Section Two, the R&I mortgage trustee is authorized upon default in interest payments or appointment of a receiver to withhold dividend payments payable to stock held as collateral for the mortgage and apply it pursuant to the mortgage.

80. The Trustees have not paid any rentals of $5 per annum on shares owned by the Trustees but pledged under the R&I indenture.

81. The annual rental dividends on the pledged stock (all but 161 shares of the Debtor's total holdings) is about $950,000 per annum.

82. As part of the New Haven Inclusion, one of the New Haven Estate assets which the Penn Central was required to pay for was a claim to one-half the excess income of the Grand Central Terminal Properties operations.

83. The record does not reveal specifically which of the properties mentioned in Findings 5 and 6 comprise the Grand Central Terminal Properties. (See Judge VonVoorhis' report at page 5969 of the New Haven record.)

84. The Fourth Supplemental Report of the Interstate Commerce Commission, 334 ICC 25, 39 (1968), determined the New Haven's share of the excess income to be $2,275,000, and capitalized this amount to the value of $28,887,000. This capitalized value was added to the original Commission valuation of all New Haven assets of $123 million in arriving at a total valuation of $145,-600,000. Securities and other consideration valued by the Commission at $145,600,000 were paid to the New Haven estate by the Debtor.

85. The $28,887,000 valuation of the "excess income" right was accepted by the New Haven Reorganization Court, In re New York, N.H. & H.R.R. Co., 304

F.Supp. 793, 304 F.Supp. 1136 (D.Conn. 1969), and affirmed by the Supreme Court. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

86. The $29 million increase in the total value of the New Haven assets over and above the $145,000,000 price set by the Commission's Fourth Supplemental Report and affirmed by the Supreme Court was not related to valuation of the New Haven's "excess income" right. The $29,000,000 increment in price has not been paid.

87. The New Haven transferred substantially all its assets to the Penn Central on December 31, 1968, by instruments stating that the assets were being conveyed free and clear of liens.

88. Part of the $145,600,000 consideration to the New Haven, pursuant to the findings of the Commission, was in the form of $34 million in principal amount of Penn Central divisional first mortgage bonds. Since the Debtor filed its § 77 petition, no interest has been paid on these bonds.

89. In 1971, the New Haven Estate's income (from cash and investments of $15,347,178) was $776,881. It incurred operating expenses of $794,327, over and above the interest charges ($651,250 on its $12,500,000 in outstanding Trustees' certificates). Percentage payments to certain tort claimants are included in these expenses. The New Haven trustee projects a loss of approximately $708,750 in 1972, in addition to interest on Trustees' certificates; however, consummation of the transactions covered by Order Nos. 867 and 868 (comprehensive settlement of various claims in conjunction with sale of land and facilities in Massachusetts by the Penn Central Trustees) would make substantial amounts of cash available to the New Haven trustee.

## DISCUSSION

### I.

### Issues Relating to the Properties Leased from the Harlem

The fee title to a large part of the properties (those listed in Finding 6 above) is owned by the Harlem, but leased to the Debtor under a 401-year lease, in which the Debtor has the power of sale. The continuing efficacy of that lease therefore assumes major importance in the present controversy.

In a separate plenary suit (Civil Action No. 71–2592), Fidelity Bank, acting on behalf of minority shareholders of Harlem, asserts that the lease is void *ab initio* and should be rescinded. These assertions are dealt with in a separate memorandum opinion filed concurrently herewith, setting forth my conclusion that the lease is not subject to rescission.

In this proceeding, the Trustees have petitioned for leave to affirm the Harlem lease. Fidelity Bank, derivatively on behalf of minority shareholders, opposes affirmance by the Trustees, and has filed a cross-petition to terminate the Harlem lease. Morgan Guaranty, as indenture trustee of certain Harlem mortgages, contends that if the lease is to be affirmed, the Trustees must pay the (accelerated) principal of the outstanding bonds. Morgan Guaranty, as indenture trustee under the Debtor's R&I mortgage, further contends that, if the Harlem lease is to be affirmed, the rental payable by the Trustees must be sufficient to pay specified dividends on Harlem stock, including Harlem stock owned by the Debtor and pledged to Morgan Guaranty as further security under the R&I mortgage.

The long-term lease is a common device employed in the railroad industry to achieve the operating advantages of a merger while avoiding the legal and practical difficulties a formal merger would entail, and also to achieve long-term financing of acquisitions and improvements.

In general, all or most of the lessor's railroad—both real and personal property—is leased for a term greatly in excess of its useful life, at a rental which is sufficient to amortize the lessor's outstanding debt, pay dividends on the lessor's stock, pay the lessor's taxes, and pay the lessor's corporate expenses.

Usually, in addition to the security represented by the lessee's obligation to pay rent, the lessee guarantees payment of the lessor's bonds, both principal and interest, as they mature. And, in many cases, the lessee either already owns, or later acquires, a controlling stock interest in the lessor.

At the risk of some oversimplification, it can be said that the value and soundness of railroad investments depends principally upon revenues produced by rail operations, rather than upon inherent asset value; and that profitability of operations over a particular rail line depends upon length of haul, density of traffic, and minimization of costs through avoidance of redundancy. Thus, the typical railroad lease made economic sense from the standpoint of both lessor and lessee interests.[1]

The importance of leased lines to the Debtor's rail system cannot be overemphasized. Approximately 52% of the entire system is operated under 44 leases from 41 domestic and Canadian lessors; annual rentals under these leases aggregate some $60 million. (The interrelationship of these leases and the complexities of the practical problems involved in dealing with them in this reorganization are partially reviewed in Document No. 696 herein.)

When as in this case, the lessee railroad enters into reorganization under § 77, the legal consequences are as follows:

■ The lease is, as to the balance of the term, an executory contract. The trustees are not bound by it unless and until they affirmatively adopt it. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943); Palmer v. Webster & Atlas Natl. Bank of Boston, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642 (1941); Palmer v. Palmer, 104 F.2d 161 (2d Cir.), cert.

denied, 308 U.S. 590, 60 S.Ct. 120, 84 L. Ed. 494 (1939).

■ Adoption of a railroad lease during reorganization does not preclude ultimate rejection of the lease in a plan of reorganization. § 77(b); Palmer v. Webster & Atlas Natl. Bank of Boston, *supra*. Affirmance or rejection "relates back" to the date of filing of the reorganization petition. Palmer v. Palmer, *supra*.

■ The lessor interests cannot be held in abeyance indefinitely; the Trustees must make their election within a "reasonable time." Philadelphia Co. v. Dipple, 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941); Palmer v. Palmer, *supra*.

Section 77(c)(6) of the Bankruptcy Act sets forth the procedure for insuring the continuation of service over leased lines in the event the lease is rejected by the Trustees. The Trustees must continue operations unless and until abandonment is authorized by the ICC. Such operations are conducted for the account of the lessor; depending upon the profitability or unprofitability of such operations, the Trustees either will be obligated to pay the lessor a fair and reasonable compensation for use and occupancy, or will be entitled to assert a lien against the leased property for deficits incurred. Thus, it becomes necessary, for accounting purposes, to hypothesize separate operation of the leased line.

An accurate assessment of the legal propriety of the Trustees' present efforts to affirm the Harlem lease will be aided by a brief recapitulation of the salient facts: the Debtor owns most of the Harlem stock, but it is pledged as collateral security under the Debtor's R&I mortgage. The rentals under the Harlem lease are calculated principally on the basis of $5 per share of the Harlem

---

1. Undoubtedly, however, there have been instances, particularly in the East, where unnecessary facilities have been built for the sole purpose of forcing a "buy-out," through merger or lease, by a competitor. The present proceeding does not involve such a situation.

stock outstanding, exclusive of stock owned by the Debtor. However, under the pledge agreement, in the event of default, dividends on the pledged stock are payable to the indenture trustee. Thus, the rental which the Trustees would be required to bring up-to-date and continue to pay in the future, in the event of affirmance, will vary greatly depending upon whether the indenture trustee may now enforce its claim for dividends.

The Harlem lease makes the Debtor responsible for the principal and interest on certain bonds issued by the Harlem, and requires the Debtor to pay certain taxes; failure to pay these taxes constitutes an event of default under the Harlem bond issue. The Debtor has been paying the interest on the Harlem bonds, but has not paid all of the taxes, and Harlem's indenture trustees have asserted a default, and have accelerated the entire principal balance of the bonds. Thus, the cost to the Debtor's estate if the Harlem lease is affirmed will vary greatly depending upon whether these creditors must be permitted to exercise the rights mentioned.

The rail operations conducted over lines leased from the Harlem produce a net deficit. However, by reason of the development of air rights, the non-rail aspects of the properties covered by the Harlem lease produce a substantial net profit to the Debtor's estate.

### A. Petition for Affirmance; Motion to Terminate the Lease

On this phase of the case, the principal issue is whether the Trustees have acted within a "reasonable time" in seeking to affirm the lease. Fidelity contends that they have not, and that, by operation of law, the lease is now terminated.

The properties covered by the Harlem lease produce a net annual return to the Debtor's estate at the rate of approximately $6,675,000, over and above what may be termed the "normal" rental payments under the lease (i. e., $5 per share per year to the minority stockholders of Harlem, interest on the Harlem bonds, Harlem's corporate expenses, and real estate taxes.) It is clear, therefore, that the best interests of the Debtor's estate would be served if the lease were to be affirmed. While the picture would be somewhat altered if the Trustees were required to pay the dividend-rental on the Debtor's pledged Harlem stock, or the principal of the Harlem bonds, or both, even on that basis, the long-range benefits of the lease to the estate cannot be doubted.

While acknowledging that the Trustees were entitled to a reasonable period of time in which to study the situation and decide whether or not to adopt the lease, Fidelity espouses a definition of the term "reasonable time" which would have as its outermost limit the date when the Trustees were in possession of the facts supporting a judgment that the lease is a profitable one. That point was reached, Fidelity contends, at least as early as February of 1971, some seven or eight months after bankruptcy.

Fidelity relies principally upon the language of Mr. Justice Roberts in Philadelphia Company v. Dipple, *supra*, a case which involved a corporate reorganization under § 77B, the pre-Chandler Act corporate reorganization statute:

"Notwithstanding the fact that § 77B gives no specific authority to trustees in reorganization to reject burdensome leases or contracts, it is well settled that they have that right and are accorded a reasonable time within which to exercise it. If, in the opinion of the officers of the underlying companies [*i. e.*, the lessors], a reasonable time has expired those companies are not without redress. They may declare a forfeiture of the leases and abrogate the agreements for nonperformance on the part of the trustees, or they may apply to the District Court to compel an election by the trustees, to affirm or disaffirm. In the meantime, if the situation were such as to permit a proper calculation of the amount due for use and occupation, it would be

proper for the court to order the trustees to pay a reasonable sum to be treated as a payment for use and occupation in the event that the leases and agreements are disaffirmed or, on account of rent, in the event they are affirmed." 312 U.S. at 174, 61 S.Ct. at 541.

Assuming the applicability of this language to railroad reorganizations, it does not follow that Fidelity's present contentions are sound.

In the first place, the quoted language cannot reasonably be read as holding that the determination of what is a reasonable period of time for the Trustees to make their decision is within the sole province of the lessor's officers. Rather, the Court was merely pointing out various steps which might be taken by the lessor in order to bring the matter to a head and obtain a determination of the issue.

■ Fixing the duration of a "reasonable" period must necessarily occur on a case-by-case basis; the more complicated and difficult the problems involved, the greater the period of time which must be afforded the Trustees for a careful evaluation. A particular lease or contract cannot be treated in isolation. Upon assuming office, the Trustees were faced not only with the task of familiarizing themselves with the Debtor's far-flung operations, and urgent financial difficulties posing an immediate threat to continued rail service, but also with the necessity of reviewing more than 165,000 executory contracts, including 44 complicated railroad leases. For years, the leased lines had been treated as if they were owned by the Debtor, so far as revenues and expenses were concerned; segregation studies take time to prepare; moreover, the impact of affirmance or disaffirmance upon various ancillary rights and obligations of the Debtor's estate required careful study.

It is true that in the case of the Harlem lease, the relative advantages and disadvantages could be determined without reference to rail operations. Nevertheless, it is fair to assume that the process of sorting out the legal and practical consequences of affirmance or disaffirmance took time. And, rather promptly after obtaining the underlying financial data, the Trustees resumed payment of all of their obligations under the lease except for the payment of real estate taxes. I have concluded that the Trustees did act within a reasonable time in electing to affirm the Harlem lease.

Moreover, the holding of the Court in Philadelphia Company v. Dipple, *supra,* and the language employed by Mr. Justice Roberts in his opinion, supports the view that resumption of payments under a lease has the effect of rendering the question of immediate affirmance or disaffirmance somewhat less crucial than it might otherwise be. As a practical matter, so far as Fidelity and the Harlem bondholders are concerned, it makes little difference whether the Trustees now formally affirm the lease, or whether they merely continue to make payments to the bondholders and the minority shareholders pursuant to the lease; after all, even formal affirmance of the lease could be rescinded in the reorganization plan. True, an interim decision to disaffirm the lease would not be subject to reconsideration in the reorganization plan. But the petitioners can scarcely be heard to argue that the Trustees should long ago have come to the conclusion that the lease should be disaffirmed.

■ A final, and, in my opinion, conclusive reason for rejecting Fidelity's contentions that the Trustees' attempt to affirm the lease comes too late lies in the fact that the Trustees acted within the time period prescribed by this Court's orders relating to the affirmance or disaffirmance of leases and executory contracts. Order No. 1 herein provided a six-month period for such determinations, but this period was later extended by Orders Nos. 96, 190, 419,

462, 475, 555, and 853. In my judgment, the Trustees, and all parties in interest, had a right to rely upon these orders in determining their course of action, unless and until the time period prescribed therein were modified, either by this Court upon reconsideration, or by an appellate court. Fidelity cites General Finance Corp. v. New York State Railways, 54 F.2d 1008 (2d Cir. 1932), for the proposition that such extensions do not insulate the Trustees from the consequences of unreasonable delay, or serve as final determinations of what is a reasonable period of time for affirmance or disaffirmance. The actual holding of that case was that the extensions granted by the reorganization court were reasonable, and that the receivers' decision to disaffirm, which was made within the period allotted, was valid. The question of whether the Trustees and other creditors could reasonably rely on the district court's extension orders was neither involved nor discussed in the opinion. Moreover, the case involved a decision by the receivers to disaffirm, a step which ordinarily involves a much more drastic interference with the rights and expectations of the lessor than a decision to affirm.

In my opinion, a lessor or other contracting party who feels that a reorganization court has unduly extended the time for affirmance or disaffirmance should either appeal from the extension order, or apply to the reorganization court for a reduction of the time limit. In either case, the application of equitable principles would undoubtedly require that the Trustees be afforded at least some brief time in which to act in the knowledge that they could no longer rely upon the previous extension order. Any other approach would render reorganization proceedings totally chaotic, and would be likely to produce unconscionable windfalls for lurking lessors.

For all of these reasons, Fidelity's motion to terminate the lease will be denied, and the Trustees will be authorized to affirm the Harlem lease.

### B. Affirmance Conditions

1. Payment of the Accelerated Principal of the Harlem Mortgage Bonds

Under the Harlem lease as amended, the Debtor is required to pay at maturity the principal of the bonds issued under the Harlem Gold Bond Mortgage and Second Mortgage. The present amount of these bonds outstanding is approximately $10 million. Morgan Guaranty Trust Company, the indenture trustee, has accelerated the principal of the bonds under both mortgages (Findings Nos. 75 and 77), solely by reason of the fact that the Trustees' portion of the real estate taxes have not been paid since reorganization. Interest on the bonds has been paid currently by the Trustees; the Harlem is the only domestic leased line whose bondholders are receiving their interest payments.

The issue presented is whether, upon affirmance of the Harlem lease, the Trustees must now pay off these bonds, or whether the claim for payment of the accelerated principal is one which should be dealt with in the plan of reorganization. I am satisfied that the latter is the correct choice.

The general rule, of course, is that trustees in reorganization must either affirm a contract in its entirety, or reject it in its entirety. In re Italian Cook Oil Corp., 190 F.2d 994 (3d Cir. 1951); Johnson v. Kurn, 95 F.2d 629 (8th Cir.1938). Thus, the Trustees could not be permitted to affirm the Harlem lease while avoiding the obligation, imposed by the lease, to pay the principal of the Harlem bonds at maturity. And it has been held that a reorganization court may not enjoin acceleration of bonds in default. Guaranty Trust Co. of N.Y. v. Henwood, 86 F.2d 347 (8th Cir.1936), aff'd, 307 U.S. 247, 59 S.Ct. 847, 83 L.Ed. 1266 (1939). But all that this means is that technical acceleration for default may not be enjoined. The case did not involve questions of payment, or of ultimate treatment of the claim in the reorganization plan. Indeed, in the Guaranty Trust

case, the holding that the right to accelerate was a substantive right which could not be abrogated in bankruptcy was based upon the fact that there the due date of payment was crucial in connection with certain choice-of-currency options; immediate payment was not required.

As noted above, § 77(b) provides that the plan of reorganization may reject leases and other executory contracts notwithstanding earlier affirmance by the Trustees. Thus, the statute plainly contemplates that, in considering the final adoption of a plan of reorganization, the Trustees, the ICC, the Court, and the interested parties are to have a fresh opportunity at that time to reevaluate the lease in question, and determine whether its benefits and burdens should be permanently accepted. The statutory purpose would be frustrated if, as a condition of the initial affirmance, the Trustees were required actually to pay the accelerated principal amount of the lessor's bonded indebtedness.

The lessor's system includes some 44 leased lines. It is fair to assume that virtually all of these leases make the Debtor responsible for the lessor's bonds, and that the related indentures provide for acceleration upon default. If the present contentions of Morgan Guaranty were accepted, the Trustees could not affirm any of these leases, since they obviously lack the cash to pay off the lessors' bonds. While this might not have much immediate effect upon the Debtor's rail operations, the long-range implications of any such result would be intolerable.

Moreover, the provision of § 77(b)(4), that a reorganization plan may provide for the cure or waiver of defaults, would be largely meaningless, if it were held that all defaults must be rectified at the time of initial affirmance. And the accepted doctrine that affirmance or disaffirmance "relates back" to the filing of the reorganization petition, Palmer v. Palmer, *supra*; In re Central of Georgia

Ry. Co., 47 F.Supp. 786 (S.D.Ga.1942); and *see* Meck, Railroad Leases in Reorganization: II, 49 Yale L.J. 1401, 1409–10 (1940), provides further reason for rejecting Morgan Guaranty's argument.

In my opinion, the leading case of Continental Illinois Nat'l. Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 110 (1935), squarely justifies holding that, while the Trustees in affirming the Harlem lease must acknowledge all of the obligations imposed by the lease, enforcement of a remedy for immediate payment of accelerated bond principal may, and in this case should, be deferred.

2. *Payment of Dividends on the Debtor's Harlem Stock, Pledged with the Trustee of the R&I Mortgage*

The R&I Mortgage constitutes a lien on most of the real estate formerly owned by the New York Central, now owned by the Debtor. In addition, the R&I indenture trustee holds the Debtor's Harlem stock as collateral security (Finding No. 78). Under the terms of the R&I indenture, in the event of default the indenture trustee is entitled to receive dividends on the pledged stock and apply them to the mortgage debt. Under the Third Supplemental Contract to the Harlem lease, the Debtor is excused from paying that portion of the rental representing $5 per share per year on stock owned by the Debtor, only if the R&I indenture trustee is not entitled to receive the dividends under the mortgage. The annual dividends on the pledged stock would amount to about $950,000.

Morgan Guaranty, as indenture trustee of the R&I mortgage, contends that, as a condition of affirmance of the Harlem lease, the Trustees must either pay all arrearages and continue to pay currently the dividends on the pledged stock, or acknowledge that Morgan's claim to these dividends ranks as an administration claim.

It should be noted at the outset that the resolution of this phase of the con-

troversy will not affect the lessor. Under any view of the matter, the ultimate issue is whether dividends on pledged stock should be paid over to the pledgee, or retained by the pledgor to meet operating expenses. Thus, even if it were to be held that, for purposes of formal compliance with the rental requirements of the lease, the Trustees should pay rental calculated on the basis of paying dividends on all of the Harlem stock, the issue would still remain whether the Harlem should pay these dividends to the Trustees/pledgors, or to Morgan Guaranty/pledgee. Whatever rights Morgan has to receive the dividends arise under the R&I indenture and the pledge agreement; its claims are against the Debtor, not the Harlem.

 It is clear that a reorganization court may properly order that dividends on pledged securities be paid to the Debtor's estate and expended for operating purposes. R.F.C. v. Kaplan, 185 F. 2d 791 (1st Cir.1951); 6A Collier on Bankruptcy, § 14.03 [1] (14th ed.) and cases cited therein. Morgan's argument is virtually identical to the argument rejected by the Third Circuit in In re Philadelphia & Reading Coal & Iron Co., 117 F.2d 976 (3d Cir.1941). In that case, Judge Maris concluded that there is no justification for treating income from pledged stock any differently than income from real property subject to a mortgage lien, Central Hanover Bank & Trust Co. v. Philadelphia & Reading Coal & Iron Co., 99 F.2d 642 (3d Cir. 1938); and that it was appropriate for a reorganization court to suspend a pledgee's contractual right to receive the income from pledged securities, and to permit the trustees to use the income to support the current operations of the debtor, if the income was needed for that purpose. *See also* In re Philadelphia & Reading Coal & Iron Co., 141 F. 2d 954 (3d Cir. 1944); In re Industrial Office Building Corp., 171 F.2d 890 (3d Cir.1949).

 That the Trustees need this income to assure continued rail operations

pending reorganization cannot be doubted. While the results of Debtor's current operations continue to improve, the Trustees have not yet been able to resume payment of current real estate taxes. Because of seasonal fluctuations, cash flow projections remain marginal. The cash drain occasioned by tropical storm Agnes has been severe. In application of the principles set forth in the cases cited above, I have concluded that the Trustees should retain the benefit of the dividends on the pledged Harlem stock.

I express no view as to whether Morgan Guaranty is entitled to administration claim status in connection with these deferred dividend payments. I believe all such matters should be resolved in connection with the proof of claims program and the plan of reorganization.

### C. *The Debtor's Power of Sale Under the Harlem Lease*

 Having concluded that the Harlem lease is not terminable and may be adopted by the Trustees, I turn now to the issues which have been raised concerning the proper scope of the Debtor's power of sale under that lease. Fidelity, derivatively on behalf of the Harlem, asserts that the lessee's power of sale extends only to leasehold rights, and not to the Harlem's reversion, with the result that the Trustees cannot convey clear title without the joinder of the Harlem. Morgan Guaranty, as indenture trustee under the Harlem Gold Bond and Second Mortgages, contends that the lien of these mortgages covers the reversionary interest of the Harlem, hence that no sale of the entire fee can take place without its consent expressed in the form of releases from the mortgages. Morgan Guaranty further asserts that the provision of § 77(*o*) of the Bankruptcy Act which empowers the reorganization court to authorize sales "free and clear of lien" is unavailing when the property interest sought to be conveyed is not that of the Debtor, but of a third party.

All of these issues are closely related, and will be considered together. Their proper resolution depends essentially upon the reasonably clear language of the documents involved, namely, the Harlem lease and the two mortgages.

The lease from Harlem as lessor to the Central as lessee (now the Debtor) was executed as of 1873, for a term of 401 years, and gave the lessee the power of sale which is now in dispute, and which will be discussed in detail later. The Harlem Gold Bond Mortgage was executed in 1897, and the Second Mortgage was executed in 1943. The Habendum clauses of both mortgages, beyond any question, mortgaged only the Harlem's interest (*i.e.*, its interest as lessor) in the properties. (Findings Nos. 49 and 58.) Moreover, both mortgages were expressly made subject to the rights of the Central under the lease (Findings Nos. 50 and 59). Thus, the crucial issue, as to both Morgan's and Harlem's present contentions, is the true meaning and correct application of the terms of the lease.

The pertinent provisions are contained in Articles Sixteenth and Seventeenth of the lease. The full text of these articles is set forth in the appendix to this Opinion. After providing that the Central might, during the term of the lease, "change and alter the line, way and gauge of the said demised railroad or branch" and "discontinue any part of the present way or track of said railroad or branch, and any of the machine shops or depots not required for the use of the line" and that the Central might also "if it shall deem it necessary, purchase and acquire title to any additional real estate for the use of said road, or may exchange its lands or buildings for other lands more convenient or necessary for its use, and of equal value for the uses and purposes of the said road,", the lease, in Article Sixteenth, specifically provides that the Central

" . . . may also, from time to time, during the continuance of the said term, sell and dispose of such part of the demised premises and property as may not be necessary for the use of the said demised railroad and branch; and [the Harlem] shall in the case of any such sale or exchange and upon the demand, in writing, of [the Central] at any time, and from time to time, execute, in due form of law, a good and sufficient deed, but without convenants of warranty or title, of any part of the said premises which [the Central] may so agree to sell or exchange . . . on such terms and conditions, not inconsistent with the rights of [the Harlem] as [the Central] may require. . . . ."

Article Seventeenth makes it clear that, at the conclusion of the lease, there is to be an accounting. The Central (Debtor) is to pay to the Harlem, without interest, the proceeds from sales of property sold during the term of the lease. Any property added to the Harlem's line by the Central by way of purchase is to be paid for by the Harlem, if the Harlem elects to keep the additional property, by reimbursement of Central's acquisition costs, without interest.

It would be difficult to envision a clearer or more sweeping power of sale. While such provisions would be unusual in ordinary leases, they are not at all surprising in a railroad lease. It was plainly the intent of the parties to achieve a consolidation of the operations of the two railroads, and to enable the Central to deal with the property as freely as if it were the owner, so long as its dealings did not detract from or interfere with the continued operation of the railroad. Thus, the Central was to indemnify and save harmless the Harlem from all claims, assume the obligation of Harlem's existing indebtedness, and relieve the Harlem of entrepreneurial risks by paying a fixed rental based upon Harlem's corporate expenses and a return on Harlem's stock which was equivalent to underwriting the fair value thereof.

It is apparent from the lease language that the only restrictions upon Central's

right to dispose of non-essential property were these: (1) If the property was to be disposed of by exchange, rather than by outright sale, the property received in exchange must be of equivalent value to the property disposed of; and (2) If the property was to be disposed of by outright sale, the terms and conditions of the sale must be "not inconsistent with the rights of [the Harlem]."

The lease provides many "rights" for the Harlem, but nowhere is there the slightest suggestion that the Harlem's consent to such sales was required, or that the Harlem retained any reversionary interest in the property disposed of by the Central. The quoted phrase, in the context of this lease, undoubtedly refers to the rights reserved to the Harlem in the Seventeenth Article, namely, the obligations of the Central (1) to surrender at the expiration of the lease "the said railroad and branch, with a perfect track, and all proper depots, stations, shops, grounds, buildings, structures, etc. and in as good state and condition, and of as much value, in all respects, as when it received them"; and (2) to "account for and pay over to [the Harlem] the consideration money received for any portion of the lands hereby demised, which having been found not necessary for the use of the said demised railroad and branch, may have been disposed of absolutely, except such as may have been exchanged for other lands of equal value; but no interest is to accrue on such consideration money during the continuance of this contract."

It bears emphasis that the entire theme of the lease, manifest in all of its provisions, was to give the Central a free hand in dealing with the properties, so long as the operating railroad would be preserved for restoration to Harlem at the conclusion of the lease. If Central deemed it necessary for efficient rail operations, Central could acquire additional property, either by exchange or by purchase; title to property thus acquired was to be placed in the name of the Harlem, but the Harlem could reject it at the end of the lease if it saw fit;

Harlem was to pay for property thus acquired which it wished to retain, not by paying the then fair value thereof, but by reimbursing Central's costs, without interest. If Central determined that parts of the demised premises were no longer necessary for rail operations, Central could sell them and keep the proceeds until the conclusion of the lease, at which time the proceeds were to be paid to the Harlem without interest. The effect of these provisions would be to restore to the Harlem at the conclusion of the lease an operable railroad, and to "net out" any difference between Central's acquisition costs and Central's receipt of proceeds from sales.

The most which can be read into the lease language would be an implied obligation on the part of Central not to make any sales for inadequate prices (by analogy to the express requirement, in the case of exchanges, that the properties be of equivalent value) or, perhaps, that no sales be made which would reduce the value of the remaining property below the value of the demised premises at the time of the lease. But even if the lease were to be thus interpreted, there is no suggestion that the sales now proposed would violate either of these requirements. Moreover, it seems reasonably clear that the "netting out" of acquisitions and sales at the conclusion of the lease was the method selected by the parties to insure that the railroad which was to be surrendered at the end of the lease would be "of as much value" as at the inception of the lease.

Article Fifteenth of the lease prohibits the Harlem from creating any additional funded debt, or issuing additional stock, after the execution of the lease, without the consent of the Central. Morgan Guaranty argues from this that the Central must have assumed that any new funded debt would be secured by a mortgage which would have priority over Central's power of sale under the lease. Morgan makes the further argument that, since Article Fifteenth does not require Central's consent with re-

gard to further unsecured debts of the Harlem, the consent provisions with regard to secured debt could not have been occasioned by any general concern of Central with the financial soundness of the Harlem. These arguments are unpersuasive. In the context of a railroad lease, it would be entirely reasonable for the long-term lessee to be concerned about the lessor's future secured debt, but to be much less concerned about the possibility of unsecured debt. Except for its street railroad, the Harlem did not contemplate continuing any operating functions after the lease was executed, and it may well have been regarded as quite unlikely that the Harlem would incur significant amounts of unsecured indebtedness thereafter. A more reasonable analysis is that the consent provisions applicable to the funded debt of the Harlem were inserted as a means of insuring that Central's rights under the lease would be unambiguously protected in any mortgage which might thereafter be executed by the Harlem. This is precisely what occurred.

Morgan further argues that since there were bonds outstanding at the time of the lease (Finding No. 45), the parties must have contemplated that later issues refunding these bonds would necessarily be secured in the same manner, i. e., with priority over the power of sale. However, Morgan concedes that the security of the refunding issues does not have priority over the lessee's possessory rights under the lease; thus, all parties agree that in fact the kind of security provided in the refunding issues was not the same as the security for the pre-lease bonds. More importantly, Morgan's argument ignores the express language of the Gold Bond and Second Mortgages, that both mortgages are subject to the rights of the lessee under the lease. This refers to all rights, not just possessory rights. It is simply inconceivable, in view of the nature and magnitude of the transactions, and the financial and legal sophistication of the parties and their counsel, that the parties intended to subject Central's power of sale to the superior rights of the mortgagees, but failed to say so.[2]

Similar considerations rule out Morgan's further argument that, by consenting to the creation of the Gold Bond and Second Mortgages, knowing that they contained provisions concerning releases of property from their liens, the lessee is estopped from denying that such releases must be obtained before the lessee can sell property. These parties simply would not have left an issue of such importance to the uncertain application of an estoppel argument. Be that as it may, there is no room for an estoppel contention, when all of the documents are considered.

In the first place, the release of lien provisions in the Gold Bond Mortgage (Finding No. 51) apply only when the Harlem is in possession of the mortgaged premises. Thus, to the extent that the release language applies to property covered by the lease, it is apparent that the release of lien provisions would come into play at the expiration or earlier termination of the lease, whenever Harlem regained possession of the property. While the language of the Second Mortgage is not expressly limited to the time when Harlem is in possession, it must be remembered (1) the mortgage covers other property of Harlem, not just the premises leased to the Central; and (2) with regard to the leased property, all that Harlem mortgaged was its interest as lessor in these properties. As discussed above, Harlem as lessor had no right under the lease to

---

2. Possession and use by the Central constituted notice to a subsequent mortgagee of the Central's leasehold, and gave rise to a duty to inquire about the terms of the lease. Schenectady Savings Bank v. Wertheim, 237 App.Div. 311, 261 N.Y.S. 193 (1932), aff'd 263 N.Y. 585, 189 N.E. 710 (1933); Phelan v. Brady, 119 N.Y. 587, 23 N.E. 1109 (1890); G. Osborn, Mortgages, 1207 at 361 (2d ed. 1970).

preclude Central from disposing of non-essential properties.[3]

Morgan's remaining argument is somewhat stronger. The contention is that the documents in question should be interpreted in the light of the subsequent conduct of the parties in carrying out their terms. As set forth in Findings Nos. 62 through 66, during the period from 1897 to 1953, there were many instances in which the Harlem requested and obtained releases from the Gold Bond and Second Mortgages for properties sold by the Central. It is clear that Central was aware of this practice, and indirectly participated in it by handling some of the paperwork. (Of course, during much of this period, the relationship between the Harlem and the Central was such as to encourage a certain amount of informality in handling such matters.) A plausible explanation of the development of this practice has been offered by the indenture trustee of the Hudson River Mortgages. The suggestion is that this was simply a matter of convenience. The rail property of the Harlem was being operated, and the Central was making various "additions and betterments" to the property. Obtaining releases from the Harlem mortgages imposed no appreciable burdens on the Central, and made it easier for the Central to sell the properties.

It is highly questionable that the release practices followed by the Harlem and its mortgage trustees have probative value on the issue of the intent of the Central and the Harlem in 1873. The present situation is quite unlike that presented in New York Central R. R. Co. v. New York & Harlem R. R. Co., 185 Misc. 420, 56 N.Y.S.2d 712 (1945), aff'd, 272 App.Div. 870, 72 N.Y.S.2d 404 (1st Dept. 1947), aff'd 297 N.Y.S. 820, 78 N.E.2d 612 (1948), in which this very same lease was involved. The issue in that case was whether the Central was required to pay federal income taxes levied against the Harlem. In imposing such liability, the court relied heavily upon the conduct of the parties, specifically the fact that Central had been paying Harlem's other taxes over the years. Since the parties could not have considered federal income tax questions when they negotiated the 1873 lease, the language of the lease was not dispositive of the question, and the court necessarily had to consider the later actions of the parties in order to arrive at a proper adjustment of their relative rights and obligations with respect to federal income taxes. Moreover, there is an important distinction in the weight to be attributed to the conduct of the parties to a lease in determining their rights *inter se*, and weight to be attributed to the conduct of the lessor and the indenture trustee of the lessor when the basic allocation of property rights under the lease is at issue.

In any event, the only firm conclusion which can be drawn from the conduct of the parties is that, during the period from 1897 to 1953, the Central on many occasions did not choose to enforce all of its rights under the power of sale provision in the lease. The impact of even this conclusion is considerably diluted by the conduct of the parties since 1953.

Some further observations may be appropriate. The power of sale provision in the lease is applicable only to property not necessary to the rail operations on the leased property. The availability of the present Park Avenue Properties for sale is not a consequence of abandonment of rail operations, but rather of the more efficient use of subsurface rights which have resulted from modern development of the properties. The core

3. Article Sixteenth provides in part:
"[D]uring the continuance of the said term, [the Central may] sell and dispose of such part of the demised premises and property as may not be necessary for use of said demised railroad and branch. . . ."

This language does not support Morgan's contention that the Park Avenue Properties are essential to the Harlem line because the properties generate income to set off operational losses. Rather physical interdependence is the test to be applied.

of rail properties originally mortgaged in 1897 still stand in the Harlem's name, not subject to the power of sale provision. On the basis of evidence submitted in the Fidelity plenary action, and more fully discussed in that Opinion, the value of the present Harlem rail assets (on a going concern basis, calculated at reproduction cost new less depreciation) is $450 million, and its salvage value is $60 million. A principal argument of Morgan throughout this proceeding has been that no one would have purchased the $7.8 million in bonds issued in 1943 unless the Park Avenue Properties were subject to that mortgage. I cannot accept that factual premise. The asset value of the rail properties in 1943 was many times greater than the $7.8 million in bonds then being issued, and the earnings value during that period was also quite substantial. Moreover, the Central obligated itself to pay the principal and interest of these bonds at maturity. Thus, it is clear that the 1943 bonds were adequately supported, without the security of the Park Avenue Properties.

And finally, while the development of the Park Avenue Properties was not in contemplation when the 1897 Gold Bond issue was negotiated and sold, the Park Avenue Properties were largely in existence when the 1943 Second Mortgage transaction occurred. The values of these properties were either known or readily ascertainable. But the Second Mortgage makes no reference to these assets, and was clearly made under and subject to the rights of the Central. It is, again, inconceivable that this omission could have been inadvertent.

For all of the foregoing reasons, I have concluded that Articles Sixteenth and Seventeenth of the 1873 lease give the lessee the power to sell those portions of the demised premises found by the lessee to be no longer necessary for rail operations; financial independence of the rail operations is not the test, under the lease, for determining whether property is necessary for rail operations; the properties in question are no longer necessary for rail operations; the Debtor's power of sale under the lease is property of the Debtor within the meaning of § 77; upon exercise of the Debtor's power of sale by the Trustees, the Harlem's reversionary interest is terminated; the liens of the Harlem mortgages do not extend to properties thus sold by the Trustees; and therefore, the consent of neither the Harlem nor the indenture trustees of the Harlem mortgages is required in order to consummate the sales.

## II.

### Issues Relating to All Properties

A. *Authority of the Court Under § 77(o)*

The Bankruptcy Act, in § 77(o) provides:

"The trustee or trustees, from time to time, shall determine what lines or portions of lines of railroad and what other property of the debtor, if any, should be abandoned or sold during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest, and shall present to the judge petitions, in which other parties in interest may join, for authority to abandon or to sell any such property; and upon order of the judge made after a hearing pursuant to such reasonable notice by publication or otherwise as the judge may direct to parties in interest, authorizing any such abandonment or sale, but only with the approval and authorization of the Commission when required by the Interstate Commerce Act as amended February 28, 1920, or as it may be hereafter amended, the trustee or trustees shall take all steps and carry out all proceedings necessary for the consummation of any such abandonment or sale in accordance with the order of the judge. Any such order of the judge shall be a final order for the purposes of appeal. The judge may order and decree any sale of property,

whether or not incident to an abandonment, under this subsection at public or private sale and subject to or free from liens. The proceeds derived from any such sales shall be received by the trustee or trustees subject, in case the property was sold free from lien, to any liens thereon at the time of sale, and shall be applied or disposed of in such manner as the judge by further order shall direct. The expense of such sale shall be borne in such manner as the judge may determine to be equitable. The judge may order the trustee or trustees of the debtor to deposit such proceeds with any mortgage trustee entitled thereto, to be applied in payment of all or part of such mortgage."

The statutory language meticulously distinguishes between abandonment of "lines or portions of lines," involving ICC approval, and sales of "other property," requiring only the Trustees' decision and the Court's approval. The notice and hearing provisions insure that all parties affected will have an opportunity to express their views.

The argument is made that the legislative history of this statute discloses a Congressional intent to permit abandonment or sale only of properties which are non-productive. It is indeed doubtful that there is any need to refer to legislative history as an aid in interpreting the reasonably clear statutory language. That point need not be decided, for the legislative history here rules out the limiting interpretation advanced by the parties opposing the Trustees' petition.

It is true that the 1935 amendment (which added the sale provisions quoted above) stemmed from a report and legislative recommendation put forward by the Federal Coordinator of Transportation (House Document 89, 74th Cong. 1st Sess.). And it is also apparently true that the Coordinator was prompted to consider the question of interim dispositions of property during a § 77 reorganization by a specific instance in which questions arose concerning the legality of a particular railroad debtor's attempts to sell an unremunerative branch line to a competitor (Coordinator's Report at 103, Hearings before the Committee of the Judiciary on H.R. 6249; 74th Cong. 1st Sess. 1935, p. 58); and the brief House and Senate reports (H.R. 1283, 74th Cong. 1st Sess., p. 5; Senate Report 1336, 74th Cong. 1st Sess., p. 5) also referred to this particular instance. The Coordinator's Report mentioned unremunerative branch lines; while the House and Senate reports referred to sales "when severance is to the good interest of the Debtor's estate as well as in the public interest." Significant changes in the statutory language took place before final enactment.

The legislation recommended by the Coordinator related only to abandonments, but the statute as finally enacted, as noted above, covers not only abandoned property, but sales of "other properties" as well. In the course of the debates, Congressman Michener, a member of the House Committee, stated that the 1935 Act was a product of legislative compromise, resulting in many deviations from the Coordinator's original proposals. 79 Cong. Record 13300 (1935).

■■ There is nothing in the statute which can be fairly read to limit sales of "other properties" to properties which do not produce income. If such a limitation had been intended, it would no doubt have been inserted. In short, the legislative history of § 77(*o*) does not justify the conclusion that only non-productive properties can be sold during reorganization.

Of course, the fact that a property produces income is certainly relevant in determining whether the proposed sale would be advantageous to the estate and the reorganization process. But there can be many situations in which a sale would be decidedly advantageous to the estate, even though the property produces income. For example, a branch line being operated by the Debtor on a break-even basis, or at a slight profit,

might be more valuable to some other railroad which, by reason of its configuration, could operate the branch more profitably. Or, income-producing non-rail property might be located in an area of declining real estate values, or the Trustees might be faced with the prospect of making substantial repairs to the property.

In short, whether a property produces income or not is merely one factor to be taken into account in deciding whether a sale of the property would be in the best interests of the Debtor's estate and its reorganization.

Certain respondents make the further argument that permitting interim sales under § 77(*o*) would be improper because of the procedural differences between that section and the approval of a plan of reorganization. Section 77(b)(5) does permit a plan of reorganization to provide for the sale of assets. And it is probably correct that persons objecting to a proposed sale would have more opportunities to attack the sale in connection with a reorganization plan, which would be subject to review by the ICC and two separate reviews in this Court, but this procedural distinction is of no moment. The procedures set forth in § 77(*o*) completely protect the rights of all parties in interest. To the extent that the objection is that it would be preferable to await the formulation of a plan of reorganization before approving a proposed interim sale, that issue, too, must be fairly considered under § 77(*o*), and the determination of the reorganization court is subject to interim appellate review.

B. *The New Haven Trustee's Petition to Sequester Income from the Grand Central Terminal Properties*

The background of this petition is set forth in Findings Nos. 82 through 89. Briefly, one of the assets transferred to the Penn Central by the New Haven estate, in connection with the New Haven's inclusion into the New York Central-Pennsylvania Railroad merger, was the New Haven's right under a series of agreements executed in 1907 and thereafter, to receive one-half of the "excess income" from the Grand Central Terminal properties, including Grand Central Terminal and most, but not all, of the properties herein designated as the "Park Avenue Properties." Excess income for present purposes can generally be defined as net income less "all [Grand Central] Terminal expenses." Pennsylvania Railroad Company—Merger—New York Central, 334 ICC 25, 31 (4th Supplemental Report 1968).

The ultimate outcome of the New Haven Inclusion Cases, 399 U.S. 392, 438–451, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), was the determination that the total price which should be paid by Penn Central for all of the New Haven assets was increased by some $29 million over the figure set by the Commission and approved by the New Haven reorganization court. Sequestration of rents from the Debtor's Park Avenue Properties is sought as a means of insuring that cash will be available to pay this $29 million increase in the purchase price, and to prevent depletion of the New Haven's present capital assets resulting from costs of litigation in this reorganization and before the New Haven reorganization court.

It should be noted that we are here concerned only with the additional $29 million due the New Haven. There is no connection between that figure and the "excess income" claim as such. (The capitalized value of the excess income right was included among the New Haven assets, which the Penn Central has already paid for by payment of a consideration mix set by the Commission; by happenstance, the capitalized value of the excess income was approximately $28 million; but it is clear that the excess income right was among the assets conveyed in 1968.)

The income which the New Haven trustee seeks to sequester is generated by an asset that was conveyed to

the Penn Central in December of 1968, free and clear of all liens. Thus, there is no mortgage lien or legal property interest in the New Haven comparable to the mortgage lien of the Hudson River Mortgage trustees. Since the petition of the Hudson River Mortgage trustees for sequestration is being denied, for the reasons discussed elsewhere (see Part II(D), *infra*), it follows that the New Haven trustee's petition must also be denied.

In adopting the foregoing analysis, I do not wish to be understood as making a final ruling on the precise status of the New Haven's interests in this case. Throughout these proceedings, and in the present petition, the New Haven trustee has consistently taken the position that the New Haven estate is entitled to an equitable lien on the property which it transferred to the Penn Central, and that this lien must be accorded priority above all other secured debt at least to the amount of the additional $29 million mentioned above. Relief similar to that presently requested was initially granted by the New Haven reorganization court, In re New York, New Haven & Hartford Ry. Co., 330 F.Supp. 131 (D.Conn.1972), but the decision was reversed by the Second Circuit Court of Appeals on jurisdictional grounds, In re N.Y., N.H. & H. Ry. Co., 457 F.2d 683 (2d Cir. 1972), and the Supreme Court has recently denied certiorari. (409 U. S. 890, 93 S.Ct. 111, 34 L.Ed.2d 147 1972.)

The decision of this Court in In the Matter of Penn Central Transportation Co., Debtor . [Re: Claim of Richard Joyce Smith, Trustee of the New York, New Haven & Hartford Railway], 337 F.Supp. 779 (E.D.Pa.1972), was to the effect that the status of the New Haven interests should be determined initially by the ICC in connection with a plan of reorganization of the Penn Central, and that, in any event, the issues must be determined in a procedural setting adequate to protect the interests of all parties affected thereby. In order to provide interim protection to the New Ha-

ven's claim, I ordered that the New Haven trustee be deemed to have a tentative lien, indeterminate in amount and indeterminate in priority, on substantially all of the assets conveyed by the New Haven to the Penn Central. This order is pending on appeal before the Third Circuit Court of Appeals. For the present, I adhere to these views. All that is being decided at this juncture is that, on the issue of sequestration of income, the New Haven trustee's tentative lien occupies no better position than the lien of the Hudson River Mortgages. The same reasons requiring denial of sequestration at the request of the Hudson River Mortgage trustee justifies denial of the New Haven trustee's petition.

It should be noted that the principal reason advanced by the New Haven trustee for immediate sequestration, namely, the New Haven's shortage of cash, has largely disappeared, by reason of Orders Nos. 867 and 868 of this Court, implementation of which will make adequate cash available to the New Haven trustee.

C. *Approval of the New Haven Trustee*

The New Haven trustee further contends that under the 1907 agreement and its modifications, the New Haven estate had a property interest in the Grand Central Terminal properties, so that these properties could not be sold without the New Haven's consent. Assuming that to be true, it is clear that the New Haven's interest in the properties was in fact conveyed to the Debtor's predecessor in 1968, free and clear of liens, and free and clear of all claims of the New Haven estate (except its rights to receive the consideration therefor). Even if the opinion and order of the New Haven reorganization court, *supra*, had been upheld, this basic fact would not have been altered.

Neither the equitable lien originally imposed by the New Haven reorganization court, nor the tentative lien imposed by this Court, implies any requirement

of the New Haven's consent to sales of property.

Whatever the rights of the New Haven may ultimately prove to be, by virtue of § 77(*o*) they will be transferred to the proceeds of the sales; the properties themselves may be sold free and clear.

### D. *Other Petitions to Sequester Income*

The Hudson River Mortgage trustees represent bondholders under three of the Central's major bond issues (Finding No. 9). These mortgages are secured by substantial parts of the rail properties west of Buffalo, and by the Debtor's fee and leasehold interests in the Park Avenue Properties (Findings 5 and 6). Interest on the bonds has not been paid since reorganization, and the Debtor's portion of real estate taxes has not been paid. Under Order No. 1, the mortgage trustees are enjoined from exercising their remedies under the mortgage by reason of these defaults.

The Park Avenue Properties generate substantial amounts of income. Although the record is, unfortunately, not clear as to the precise amount of net income derived therefrom, the amount is at least $10 million annually. The Trustees have been using this income for general operating expenses. The Hudson Mortgage trustees (and, in a separate petition, an individual bondholder, Harriet Signer) have petitioned for sequestration of the income from the properties. The petitioners request that this income be escrowed for the benefit of the Hudson River bondholders (subject to certain claims of the Harlem bondholders) and that there be an accounting of all post-reorganization income, and a declaration of administration claim status for the income thus far expended by the Trusteees.

The basic issue is this: Does a § 77 reorganization court have constitutional and statutory power to permit the Trustees of the Debtor railroad to use for operational expenses during the period before a plan of reorganization is filed, income generated by real property subject to mortgage liens; and, if so, should such permission be extended under the present circumstances?

In many respects, the same considerations are applicable here as were discussed in Part I(B)(2) of this Opinion, in connection with the treatment of dividends on pledged stock.

While a reorganization court undoubtedly has the power to require that income from mortgaged property be paid to the mortgage trustees, Missouri Pacific Ry. Co. 5¼% Secured Serial Bondholders Committee v. Thompson, 194 F.2d 799 (8th Cir. 1952), or to restrict the use of rental income by the Trustees of the Debtor, In re Franklin Garden Apartments, 124 F.2d 451 (2d Cir. 1941), it is at least equally clear that a reorganization court does have the power to permit the Debtor's Trustees to use this income for operating expenses. In re Philadelphia & Reading Coal & Iron Co., 117 F.2d 976 (3d Cir. 1941); *see also* Central Hanover Bank & Trust Co. v. Philadelphia & Reading Coal & Iron Co., 99 F.2d 642 (3d Cir. 1938); 6A Collier on Bankruptcy, § 14.-03 [1] (14th ed).

The Signer brief argues that the Third Circuit decisions just cited are an aberration and should be disregarded in this proceeding in view of the decision of the Supreme Court in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). The *Radford* case held that the original Frazier-Lemke Act (granting farmers certain relief from foreclosures) was unconstitutional. However, a second Frazier-Lemke Act was passed in 1935, and its constitutionality was upheld in Wright v. Vinton Branch, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937) (not cited or referred to in the Signer brief). The Philadelphia & Reading Coal & Iron Co. cases were decided by the Third Circuit shortly after the *Radford* decision by the Supreme Court. There is nothing in *Radford* which undercuts the holdings of the Third Circuit on the propriety of permitting a debtor in reor-

ganization to use rental income for operational expenses. Needless to say, the same is true of Wright v. Vinton Branch.

The Hudson River Mortgage trustees argue that denial of their present petition would violate their vested property interests, by reason of the fact that unpaid real estate taxes are accruing on the properties, and impair their security. The short answer to this argument is that the *claim* of the bondholders is not diminished by the prior tax liens on the property, nor would the value of their security for purposes of the plan be affected by the existence of the tax liens. If the mortgage trustees' theory were adopted, it would follow that § 77 relief would be available only to a railroad whose financial difficulties were confined to an overburdened capital structure. In a case such as the present one, where operations do not generate sufficient cash to cover all real estate taxes, temporary deferral of taxes is a necessity. Order No. 70 herein, authorizing deferral of taxes, has been upheld on appeal In re Penn Central Transportation Co., 452 F.2d 1107 (3d Cir. 1971), cert. denied, New Jersey v. Penn Central Transportation Co., 406 U.S. 944, 92 S. Ct. 2043, 32 L.Ed.2d 331 (1972). The essence of these decisions is that, consistent with the provisions of § 77, it is appropriate to provide the Trustees some "breathing room" so that, in their efforts to rehabilitate the Debtor, they can, for a reasonable period, use cash which would otherwise have gone to pay taxes, to meet current operating expenses. If the mortgage trustees' argument were to be accepted, the entry of a tax deferral order would serve merely to create grounds for depriving the Trustees of income, and would be self-defeating. In my judgment, there is no basis for imposing such a limitation on the statutory scheme of § 77.

Thus, the real issue is whether sequestration of the income from the Park Avenue Properties would substantially impair the ability of the Debtor to reorganize and to provide continued rail service. For the reasons summarized in Part I(B)(2) above, I have concluded that it would, and that under the circumstances the Trustees should continue to have the use of this income.

Needless to say, just as in the case of the tax deferral orders, this determination is subject to reconsideration at any time, as circumstances develop.

A final contention is that Order No. 15 herein constitutes the "law of the case," and that denial of the present petitions would be inconsistent with that order. This contention lacks merit. Order No. 15 was entered shortly after reorganization, before the Trustees were appointed; it was entered by consent; it does not purport to be a final determination of any issue, but is merely a "status quo" order designed to prevent irreparable injury while underlying issues are negotiated or litigated. It is expressly subject to being reopened at any time upon the application of any party adversely affected thereby.

The present sequestration petitions will be denied.

## III.

### The Merits of the Proposed Sales

Findings Nos. 1 through 39 set forth in detail the relevant facts relating to the merits of the proposed sales. In deciding the ultimate question of whether the proposed sales, or any of them, would be in the best interests of the Debtor's estate and its reorganization, it is necessary to consider numerous factors, including the validity of the Trustees' appraisals; the relationship between the purchase price and the appraised values; the relationship between the income being derived from the properties and the income which could be realized from the proceeds; the economic risks of continued ownership; the conditions imposed, pursuant to the Emergency Rail Services Act of 1970, upon the government's guarantee of Trustees' certificates; the desirability of achieving a greater degree of liquidity; and the

availability and possible uses of the proceeds.

### A. *The Appraisals*

The Trustees retained the firm of Jackson-Cross Company, of Philadelphia, to appraise each of the properties. The adequacy and accuracy of the appraisals is not challenged by any of the parties, with the possible exception of the Penn Central Company (The holding company which owns all of the Debtor's stock). Counsel for the Penn Central Company interests, by cross-examination and in argument, seems to suggest that the appraisals are suspect because the Jackson-Cross Company had had very little if any prior dealing in real estate in the Manhattan area. However, it is clear that the correct appraisal techniques were employed, and that these techniques are valid irrespective of the precise location of the property. There is no specific challenge to the appraisals or any part thereof, and no evidence that any different value should be accepted. The Trustees' selection of the Jackson-Cross firm was approved by this Court, not only because of their extensive experience and national recognition in this field, but because I believed it would be desirable to retain a firm from some metropolitan area other than New York City, so as to minimize the possibility of conflicts of interest. I am satisfied that the appraisals are objective, accurate, and fair.

### B. *Alternate Appraisals Based Upon Disaffirmance*

In the case of most of the properties, the Debtor's interest is that of a lessor under long-term leases. In each such case, the "basic" appraisal assumes the continuation of these leases. In addition, alternate appraisals were prepared, on the assumption that the Trustees might disaffirm these long-term leases, and renegotiate leases based upon present rental values. These "alternate" appraisals resulted in much higher market values, since leases negotiated in the present rental market would produce a higher return. Some of the secured creditors and other parties opposed to the sales contend that the sales should not be approved because, while the proposed purchase prices compare favorably to the "basic" appraisal values, the prices are inadequate when compared to the values which could be realized if the Trustees were to disaffirm the existing leases.

The ultimate issue, which is not now squarely presented, but which may at some future time be presented to this Court, is whether the Trustees, as lessors, have the legal right to disaffirm their leases and renegotiate them at higher rentals. The law on this question is unclear. It is inappropriate to attempt any definitive discussion in this Opinion, since the issue has not been fully briefed or argued, and since the precise issue may be squarely presented for decision at some future time. There are various alternative conclusions which might ultimately be held to be sound: it might be held that § 70(b) of the Bankruptcy Act is applicable to reorganization proceedings under § 77, and that this precludes the lessor from treating a lease as an executory contract. It might be held that § 70(b)'s preclusion is applicable to proceedings under § 77 except with respect to railroad leases. It might be held that, while § 70(b) is not applicable in railroad reorganization proceedings under § 77, the Trustees' power to disaffirm is limited to leases which are burdensome, i. e., which pose a threat of loss to the estate of the Debtor. Or it might be held that, while the Trustees have the power to disaffirm, such power should not be exercised because the net effect would be to give certain secured creditors an unfair advantage over general creditors of the estate (on the theory that any increase in income which might result from disaffirmance would be offset by the claims of the tenants arising from the disaffirmance). *See,* generally, Creedon & Zinman, Landlords Bankruptcy: Laissez Les Lessees, 26 Business Lawyer 1391 (1971); Silversteen, Rejection of Executory Contracts in Bank-

ruptcy and Reorganization, 31 U.Chi.L. R. 467, 484 (1964).

In arguing approval of these sales, the Trustees take the position, not that they lack the power to disaffirm the leases, but that the proposed prices are adequate, when due weight is given to the pros-and-cons of the disaffirmance issue. While expressly reserving the right to attempt such disaffirmance in appropriate cases in the future, the Trustees point out that the legal obstacles to such disaffirmance are not insubstantial, that any such attempt would be likely to involve protracted litigation, and that it would not be prudent to reject the present offers in the hope of obtaining a better result through disaffirmance. If the Trustees were to attempt disaffirmance, and were to succeed in establishing that right, there is no assurance that the rental market then prevailing would be as favorable as it is at present. Several of the offers, by present tenants of the buildings, are substantially higher than the "basic" appraisals, thus providing some indication that the bidders are willing to pay a premium in order to avoid the possibility of disaffirmance. If the Trustees were to litigate and fail to establish their right to disaffirm, it is probable that these properties could not be sold for as high a price as the present offers.

I am persuaded that the Trustees' approach is reasonable, and that the bids should be evaluated in relation to the "basic" appraisals, but with some weight given to the unanswered questions about disaffirmance.

## C. Business Judgment

The Trustees solicited bids on some 23 separate parcels of real estate. After evaluating the bids, they filed the present petitions for approval of the sale of six of these parcels, as to which the bid price was most nearly equal to, or in excess of, the appraised value. As set forth in Table 1 of Finding No. 24, the bids range from a low of 92.6% of the appraisal, in the case of 245 Park Avenue, to a high of 145% of the appraisal,

in the case of 350 Park Avenue. If all six of the sales were to be approved, the total consideration, $59,549,000, would represent approximately 101% of the total appraised value, $58,650,000. Thus, with the possible exception of 245 Park Avenue, the proposed sale price is reasonably adequate in each case. On the other hand, however, as shown in Finding No. 26, these six properties currently produce income, after depreciation allowance, at the rate of 7.41% of the sales prices (income before depreciation allowance amounts to 8.2% of the sale prices).

Thus, unless extraneous considerations mandate a different conclusion, as a pure matter of dollars and cents, it would seem that the proposed sales should not be approved unless the proceeds could be used to produce a comparable rate of return. Among the extraneous factors which might justify departure from a strict income-comparison test are such matters as a need for cash; the desirability of greater liquidity, irrespective of immediate availability of cash; the risk of decline in values; and the Trustees' obligations under the terms of the federal loan guarantee.

If the proceeds from the sales were made available to the Trustees for investment in selected capital improvements on the Debtor's railroad, the benefits to the Debtor's operations would be equivalent to a return of approximately 20% (see Finding No. 28(c) ). However, until a reorganization plan has been adopted, or until a successful income-based reorganization is a virtual certainty, the secured creditors would undoubtedly oppose any such use of the proceeds, on the theory that the value of their security would be diminished. At best, any such use of the proceeds would probably have to await the outcome of protracted litigation of the issue. Thus, at least for the short term, and perhaps for the long term, the sale proceeds would probably be invested in government securities, and would produce a return of about 5½% or 6% (see Findings Nos. 35 and 36).

750

It thus appears that, at least for the immediate future, approval of all six of the proposed sales would reduce the income to the Debtor's estate by about $1 million to about $1.5 million annually (see Findings Nos. 36 and 37).

Turning now to the risks of retention of the properties, it should be noted preliminarily that the present leases are for long terms, and involve responsible tenants; hence, the present dollar return, except for minor fluctuations owing to participation provisions, may be viewed as constant and secure. In the case of properties owned in fee by the Debtor, the risk of a decline in market value is the normal risk of fluctuation in real estate values and obsolescence of the physical plant. In the cases where the Debtor is the lessor under long-term ground leases, the market value is the market value of the "income stream" produced by the lease. Since the income stream is fairly constant, variations in market value relate to fluctuations in the money market at any given time. The range of such fluctuations is smaller, and their impact less direct and immediate, than fluctuations in the real estate market. It is therefore clear that the risk of substantial decline in the market values of the properties under ground leases is considerably less than in the case of properties owned entirely by the Debtor. For these reasons, I have concluded that there is somewhat greater justification, in terms of risk avoidance, in approving sales of owned properties, as opposed to ground lease properties.

On the issue of liquidity, the Trustees have made out a valid case for the proposition that it is desirable, in the interest of flexibility, whether in terms of the initial steps in implementing a plan of reorganization, or in terms of dealing with interim financial emergencies, to have on hand a substantial cash fund. The parties opposing the sales have, however, also made a strong argument that a decision to dispose of major groups of non-rail assets should be deferred until more is known about the form which final reorganization is likely to take. While cash would undoubtedly be useful in revising the Debtor's debt structure, income-producing real estate might likewise be useful for that purpose.

I have concluded that there is merit in both approaches, and that it would be desirable to create a cash fund, but that it is neither necessary nor desirable to create as large a cash fund as the sale of all six properties would produce, or to incur the total cost, by way of reduction of income, which approval of all six sales would entail.

Accordingly, it is my view that, of the six proposed sales, those involving 350 Park Avenue, 280 Park Avenue East, 280 Park Avenue West, and 52 Vanderbilt Place, should be approved.

In the case of 350 Park Avenue, the bid price of $3,351,000 represents 145% of the appraised value. The present income from the property, $165,000, represents only 4.93% of the proposed sale price. Thus, the Debtor's estate would derive the benefit of an advantageous sale price, and would suffer no loss of income.

In the case of 280 Park Avenue East, the bid price, $5,251,000, is 128% of the appraisal, and the present income, $262,000, is slightly less than 5% of the proposed price. Here again, the Debtor's estate would obtain the benefit of an advantageous sale, and would suffer no diminution of income.

In the case of 52 Vanderbilt Place, the bid is only 97.1% of the appraised value, and the property presently returns $366,000 annually, or 8.86% of the proposed sale price. On the other hand, the property is owned outright by the Debtor, and the Trustees' judgment that the property should be sold at this time, in order to avoid possible decline in market value, is entitled to great weight. If the proceeds from the sale produce as little as 5% annual return, the net diminution in income to the Debtor's estate would not be substantial (in the neighborhood of $160,000 annually).

In the case of 280 Park Avenue West, the proposed sale price, $1,211,000, represents 100.9% of the appraised value. The current income from the property, $80,000, represents a return of approximately 6.6%. If the proceeds were to be invested to produce a 5% return, the estate's income would be reduced by approximately $19,450 annually. This property is owned by the Debtor's estate; while there is no basis in the record for anticipating any immediate decline in value, the desire to eliminate whatever risks may be involved provides some further justification for deferring to the business judgment of the Trustees and their advisors.

Of the remaining properties, the most difficult decision is presented in the case of 230 Park Avenue. The proposed sale price, $30,614,000, represents 102% of the appraised value. And, as the largest single transaction, the sale of this property would produce a great degree of liquidity. However, the Debtor's estate presently receives about $2,303,000 annually from the property, a return of 7.52%. If the proceeds were to be invested at a 5% return, the loss in income to the estate would be in excess of $770,000 annually. I believe this is too high a price to pay for the interim advantages of liquidity.

If the proceeds from the sale of 230 Park Avenue could be used for capital projects producing the equivalent of a 20% return, it would seem that the sale should be approved. However, unless and until intervening litigation clarifies the Trustees' right to such application of the proceeds, or the reorganization reaches a stage where such application of the proceeds would clearly be upheld, I am not persuaded that the estate should assume the reduction in income which the sale would otherwise occasion.

I have therefore concluded that the sales of 230 Park Avenue and 245 Park Avenue should not be approved at this time. (In the case of 245 Park Avenue, a further reason is that the proposed sale price, $14,994,000, represents only 92.6% of the appraised value, without any allowance for the possibility of disaffirmance; and the income presently realized from this property, $1,234,000, represents a return of 8.23% of the proposed price.)

With respect to both of these properties, as well as the other properties on which bids were received and rejected by the Trustees, there is nothing to prevent the Trustees from again seeking approval of sales, either individually or in groups, at such time as it can be shown that there is a specific intention to utilize the sale proceeds advantageously to the estate. It may be, for example, that the existing bid on 230 Park Avenue would merit approval, if the sale proposal were accompanied by definitive proposals for the use of the proceeds (e. g., for equipment financing, or specific capital improvements); in that way, approval of the sale and approval of the proposed use of the proceeds could be made interdependent, and ensuing appeals would resolve the issues conclusively and simultaneously, whichever way this Court initially decided the matter. Or, questions concerning availability of the proceeds might be resolved through preliminary litigation so that all parties could properly evaluate the proposed individual transactions. On the present record, however, since all that is proposed is the creation of a fund for possible future use, in the interests of liquidity and flexibility, loss in income for an undetermined future period must be regarded as a decidedly limiting factor.

D. *Conditions Imposed in Connection with Government Guarantee of Trustees' Certificates*

As set forth in Finding No. 27, the agreement between the Trustees and the Department of Transportation, in connection with the government guarantee of Trustees' certificates pursuant to the Emergency Rail Services Act of 1970, includes the provision:

"The Trustees shall, within 30 days from the date of execution of the guaranty agreement, submit to the Secretary a plan for the sale of non-

transportation assets of the company and its corporate subsidiaries. . . . ."

The Trustees have, of course, literally complied with this condition long since, by outlining their plans to the Secretary of Transportation. The solicitation for bids, and the present petitions by the Trustees, are in implementation of those plans. But it was and is clearly understood that actual divestiture could not be accomplished except in compliance with existing legal requirements, including the approval of this Court based upon findings that the proposed sales would be in the best interests of the Debtor's estate and its reorganization.

This does not mean that the guaranty conditions can be simply disregarded by this Court. The dominant legislative intent, even when couched in merely precatory language, is a potent factor for consideration.

In committing the federal treasury to guarantee the payment of principal and interest on the Trustees' borrowings, Congress and the Executive branch made it very plain that their willingness to underwrite the continuation of rail service by the Debtor did not extend to the Debtor's ventures into non-railroad fields of endeavor, and that the Debtor would be expected to utilize its non-rail assets to the fullest extent in supporting its rail operations. But it was surely not the Congressional intent that the Trustees should deprive the Debtor's estate of income which is sorely needed to support rail operations, or that the Trustees should liquidate non-rail holdings at inadequate prices.

In the foregoing discussion, therefore, I have proceeded to evaluate each proposed sale without regard to the loan guaranty conditions, on the theory that these conditions cannot convert an inadequate price into a fair one, nor can they change the dollar impact upon the Debtor's estate. I regard the loan guaranty conditions as providing ample further justification for approving advantageous sales, as constituting some further reason for approving borderline sales, but not as a reason for approving sales which would be detrimental to the estate. I believe that the actions taken herein, approving four of the sales and disapproving two, are entirely consistent with the letter and the spirit of the loan guaranty conditions.

### CONCLUSION

In conformity with the views expressed in this Opinion, orders will be entered granting the Trustees' petitions to sell the premises designated as 52 Vanderbilt Avenue, 280 Park Avenue East, 280 Park Avenue West, and 350 Park Avenue; denying the Trustees' petitions to sell premises designated as 245 Park Avenue and 230 Park Avenue, without prejudice; denying the various petitions to sequester income; and denying the various petitions to require, as a condition of the sales, payment of the accelerated principal of the Harlem bonds and of dividends on the Debtor's Harlem stock.

All questions relating to the disposition of the proceeds of the sales will be considered at a later hearing.

### APPENDIX

"SIXTEENTH. The said party of the second part covenants and agrees that it will, during the continuance of this contract, do every act and thing that may by law be required of or obligatory upon it, or upon the said party of the first part, in respect to the operation, condition, maintenance and use of the said railroad, branch, premises and property hereby demised, and every part thereof, including the keeping and rendition of all accounts and reports.

"That the said party of the second part shall and will at all times, indemnify and keep indemnified and harmless, the said party of the first part from all costs, suits, expenses and damages, that the said party of the first part may sustain or incur by

reason of any default or failure, or any alleged default or failure of the said party of the second part, its grantees or agents, in the operation, management or use of the said railroad branch, premises and property hereby demised, or any part thereof, or in its or their omission to do and perform any act or thing which may be required by law to be done or performed by the said party of the first part; but the said party of the second part, its successors or assigns, may, at any time *during the continuance of the demised term, change and alter the line, way and gauge of the said demised railroad, or branch, and in so doing may discontinue any part of the present way or track of said railroad or branch, and any of the machine shops or depots not required for the use of the line,* and may also change the grade or grades of the road, and alter or change the location of any of the tracks, water stations, buildings or erections appurtenant thereto, or connected therewith, and may also, *if it shall deem it necessary, purchase and acquire title to any additional real estate for the use of said road, or may exchange its lands or buildings for other lands more convenient or necessary for its use, and of equal value for the uses and purposes of the said road;* but all such alterations, changes, purchases or exchanges are to be made at the proper cost and charge of the said party of the second part; and the said party of the second part, its successors and assigns, may also, from time to time, *during the continuance of the said term, sell and dispose of such part of the demised premises and property as may not be necessary for the use of the said demised railroad and branch; and the said party of the first part,* its successors and assigns, shall in the case of any such sale or exchange, and upon the demand in writing, of the said party of the second part, at any time, and from time to time, execute, in due form of law, a good and sufficient deed, but without covenants of warranty or title, of any part of the said premises which the said party of the second part, its successors or assigns, may so agree to sell or exchange, as aforesaid, to the purchaser, or the party with whom the exchange shall be made, *on such terms and conditions, not inconsistent with the rights of the said party of the first part, as the said party of the second part may require;* but all such deeds are to be prepared, executed and delivered at the cost and expense of the said party of the second part. *All the premises received in exchange are to be conveyed to the said party of the first part, and held by the parties hereto, as if the same were now part of the premises hereby demised,* and the said party of the second part covenants and agrees to pay all taxes, assessments, and charges thereon, and protect the same against all liens thereon.

"SEVENTEENTH. The said party of the second part covenants and agrees that at the expiration or other determination of the term for which the said railroad and branch of the said party of the first part is herein or hereby demised, *it will surrender the said railroad and branch, with a perfect track,* and all proper depots, stations, shops, grounds, buildings, structures, etc., and in as good state and condition and of as much value, in all respects, as when it received them. That it will pay over to the said party of the first part the proportionate part of the two dollars per share on the capital stock of the said party of the first part that shall be due to the period between the last payment thereof made to the stockholders in the said party of the first part, under the provisions of this contract, and the date of such surrender; together with an amount equal to the interest accrued on the bonds of the said party of the first part from the date of the last payment of interest on each kind of bonds to the date of such surren-

der. *And that it will account for and pay over to the said party of the first part the consideration money received for any portion of the lands hereby demised, which having been found not necessary for the use of the said demised railroad and branch, may have been disposed of absolutely, except such as may have been exchanged for other lands of equal value; but no interest is to accrue on such consideration money during the continuance of this contract*: and, on the termination of this contract, the said party of the first part, its successors and assigns, *shall pay to* the said party of the second part, its successors and assigns, *the amount expended out of its own means, but without interest, in the acquirement, otherwise than by exchange, of additional real estate for the use of the railroad and branch hereby demised; provided, the said party of the first part shall elect to take the same; so far it shall elect not to take such real estate, it shall, if the title has been taken in its name, convey the same as the said party* of the second part shall direct, but without covenants of warranty.

"And whereas the said party of the first part has and owns, as a part and parcel of the property hereby demised, personal property in locomotives, engines and tenders, passenger cars, baggage cars, freight and other cars, tools, fixtures, machinery, supplies, material and other effects, amounting, as is agreed by the said parties hereto, to the value of one million one hundred and three thousand nine hundred dollars ($1,103,900) for a more particular account of which reference is made to a schedule hereby annexed, marked "C"; it is hereby covenanted and agreed by the said party of the second part, that, at the termination of this contract, it will surrender, or transfer and deliver to the said party of the first part, personal property of a similar kind and equal in value to that mentioned in the sale schedule and hereby demised."